[No. S124090. Aug. 28, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
CATHY DAWN GARCIA, Defendant and Appellant.

**COUNSEL**

Elizabeth M. Campbell, under appointment by the Supreme Court, and Sally P. Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Legal Services of Northern California, Gary F. Smith; Western Center on Law and Poverty, Richard A. Rothschild, Dora Lopez and Robert D. Newman for Legal Aid Association of California as Amici Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Janet E. Neeley, Stephen G. Herndon, Maggy Krell, David Andrew Eldridge, Paul E. O'Connor, Janis Shank McLean and Donald E. deNicola, Deputy Attorneys General, for Plaintiff and Respondent.

David Labahn; Greg Gibeson, Assistant Deputy District Attorney (Alameda); and Stan Kubochi, Deputy District Attorney (Sacramento) for California District Attorney's Association as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**MORENO, J.—** ■ Nearly 25 years ago, we held in *People v. Sims* (1982) 32 Cal.3d 468 [186 Cal.Rptr. 77, 651 P.2d 321], that a welfare recipient who has been exonerated of fraud charges by the Department of Social Services in an administrative hearing cannot be criminally prosecuted for welfare fraud, because the doctrine of collateral estoppel bars the prosecution from relitigating issues that were determined in the administrative hearing. The Attorney General urges us to reconsider our decision in *Sims* based, in part, on statutory changes enacted more than 20 years ago. For the reasons that follow, we conclude that these statutory and other changes do not warrant reconsideration of this court's decision in *Sims*.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant is the mother of four children. She applied for welfare assistance, representing that her household unit consisted of herself and all of her children. A dispute arose over whether defendant's two oldest children, both boys, actually were residing in defendant's household, or instead were living with their father.

In August 2000, the Butte County Department of Social Welfare (the County) sent defendant several notices of action advising her that she had received $5,839 in welfare benefits between October 1998 and June 2000 to which she was not entitled: $3,669 in cash aid and $2,170 in food stamps. The initial notices explained that "the overpayment was caused by the County," or alternately that the "County Welfare Department made a mistake," and also noted that "the wrong household size was used" to calculate the cash aid and food stamps to which defendant was entitled.

Defendant requested an administrative hearing on the County's proposal to recoup the overpayment from her future benefit grants. At this hearing, the County rescinded the notices of action; the matter was dismissed without prejudice on January 30, 2001. Later, the County issued new notices, alleging that the overpayment of cash aid and overissuance of food stamps were caused by defendant's failure to report that the two boys were living with their father, which constituted a material change in her household.

In May 2001, an administrative law judge held a hearing to determine "[w]hether the boys were members of the assistance unit and household during the periods in question," and "[w]hether the overissuance and overpayment were the result of administrative errors or [defendant's] failure to report the boys' absence from her home." Evidence admitted at the hearing included a county case worker's determination that defendant remained eligible for benefits for her sons after she reported in September 1998 that they lived with their father "half of the time." Evidence, however, also was presented to the contrary: that defendant's sons lived with their father during the week, that he had assumed primary responsibility for the care of the two boys since before 1997, and that their longest stay with defendant was for four weeks in the summer of 1999.

In the written decision that followed the administrative hearing, the administrative law judge noted that there were three potential causes of the alleged overpayment: (1) "inadvertent household error," (2) "administrative error," and (3) "intentional program violations." The administrative law judge concluded that the overpayment in this case was "the result of administrative errors of omission committed by the county welfare department," because the county did not conduct required periodic redetermination reviews and investigations. Therefore the administrative law judge ordered that "[t]he claim is granted in that all the overpayments and overissuances are determined to have been caused by administrative errors. In all other respects, the claim is denied." Defendant was ordered to repay the excess benefits.

In March 2001, while the administrative proceedings were pending, defendant was charged by felony complaint with fraudulently receiving welfare benefits of over $400 in violation of Welfare and Institutions Code section 10980, subdivision (c)(2)[1] and committing perjury by false application for aid (Pen. Code, § 118) when she "affirmatively omitted that [her sons] had moved out of the defendant's home."

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

After the administrative decision was issued, defendant moved to dismiss the criminal action, arguing that collateral estoppel barred the district attorney from proceeding on criminal charges because the administrative law decision had determined that she had received the excess welfare benefits because of administrative errors by the County. The trial court denied her motion and, following a bench trial, defendant was convicted on both counts.

Defendant appealed. The Court of Appeal reversed the judgment in a published decision, holding that the trial court erred in failing to follow *Sims*, in which this court held that collateral estoppel bars the state from prosecuting for welfare fraud a person who was exonerated of that charge in administrative proceedings. (*People v. Sims, supra*, 32 Cal.3d at p. 489.) We granted the People's petition for review.

## II. DISCUSSION

The People argue that this court should reconsider our decision in *People v. Sims, supra*, 32 Cal.3d 468 (*Sims*), in light of intervening changes in the law. In 1982, we addressed in *Sims* circumstances similar to those in the present case and held that the doctrine of collateral estoppel precluded the People from prosecuting for welfare fraud a welfare recipient who had been exonerated at an administrative hearing conducted by the county. (*Id.* at p. 489.)

In *Sims*, the Social Services Department of Sonoma County sought to recoup from June Sims alleged overpayments of aid and food stamps. Sims requested an administrative hearing to challenge the decision. Meanwhile, the district attorney charged Sims with felony welfare fraud under section 11483. The county refused to participate in the administrative hearing, asserting that the pending criminal charges divested the county of jurisdiction. After Sims presented evidence in her behalf, the hearing officer determined that the county had not met its burden of proof and ordered the county to rescind its notice of action against Sims and refund any restitution payments she had made. The county did not seek a rehearing or judicial review. Sims then moved to dismiss the criminal information, contending that the decision at the administrative hearing collaterally estopped the criminal prosecution. The trial court granted Sims's motion, and the People appealed. (*Sims, supra*, 32 Cal.3d at pp. 473–474.)

We began our discussion in *Sims* by noting that the United States Supreme Court had concluded that "[c]ollateral estoppel may be applied to decisions made by administrative agencies '[when] an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate . . . .' " (*Sims, supra*, 32 Cal.3d at p. 479, quoting *United States v. Utah Constr. Co.* (1966)

384 U.S. 394, 422 [16 L.Ed.2d 642, 86 S.Ct. 1545, 176 Ct.Cl. 1391], italics omitted; see also *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 944 [38 Cal.Rptr.3d 220, 126 P.3d 1040] (*Pacific Lumber*).) We noted that the standard formulated in *Utah Construction* supports the primary public policy goal underlying the doctrine of collateral estoppel: " 'limiting litigation by preventing a party who has had one fair trial on an issue from again drawing it into controversy.' " (*Sims, supra,* at p. 479, quoting *Bernhard v. Bank of America* (1942) 19 Cal.2d 807, 811 [122 P.2d 892].)

■    We concluded in *Sims* that an administrative hearing conducted by the California Department of Social Services (DSS) was "a judicial-like adversary proceeding," emphasizing that: 1) The hearing was impartial; 2) all testimony was submitted under oath; 3) both parties could call and cross-examine witnesses and introduce documentary evidence; 4) the parties could request that witnesses be subpoenaed; 5) regulations required that a verbatim record of the hearing be made; and 6) a written decision would issue after the hearing. (*Sims, supra,* 32 Cal.3d at pp. 479–480.) *Sims* also stressed that the administrative decision was adjudicatory in nature, as it involved applying " 'a rule . . . to a specific set of existing facts,' rather than 'the formulation of a rule to be applied to all future cases.' " (*Id.* at p. 480, quoting *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34–35, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].) Finally, we noted that the availability of a rehearing before the agency and the right to petition for review in superior court supported our conclusion that the administrative hearing was judicial in nature. (*Sims, supra,* 32 Cal.3d at p. 480.)

■    We then considered whether the traditional requirements of collateral estoppel had been satisfied. There are five threshold requirements: 1) the issue to be precluded must be identical to that decided in the prior proceeding; 2) the issue must have been actually litigated at that time; 3) the issue must have been necessarily decided; 4) the decision in the prior proceeding must be final and on the merits; and 5) the party against whom preclusion is sought must be in privity with the party to the former proceeding. (*Sims, supra,* 32 Cal.3d at p. 484; accord, *Pacific Lumber, supra,* 37 Cal.4th at p. 943; see also *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223] (*Lucido*); Rest.2d Judgments, § 27.)

In examining whether the welfare fraud issue was actually litigated at the administrative hearing, we noted in *Sims* that the respondent's request for an administrative hearing had "properly raised" the welfare fraud issue, that the controversy was submitted for a determination on the merits, and that there was a finding that made "clear that respondent's guilt or innocence of welfare fraud was actually litigated at the . . . fair hearing." (*Sims, supra,* 32 Cal.3d at p. 484.)

We also held in *Sims* that the welfare fraud issue actually litigated in the administrative hearing was "identical to that involved in the criminal proceedings." (*Sims, supra,* 32 Cal.3d at p. 485.) After noting that the same amount of overpayments, the same relevant time periods, and the same allegation that Sims had failed to report a change in her household size were at issue in the administrative hearing as in the criminal prosecution, we addressed the fact that different burdens of proof apply at administrative hearings and in criminal prosecutions. Because an administrative hearing is civil in nature, and the county must prove its case by a preponderance of evidence, the burden at the hearing is not as great as the state's burden at a criminal proceeding of proving a defendant's guilt beyond a reasonable doubt, we concluded that "if the County fails to prove its allegations by a preponderance of the evidence at the fair hearing, it follows a fortiori that it has not satisfied the beyond a reasonable doubt standard." (*Ibid.*)

We then held that the administrative law judge's decision is "final for purposes of applying collateral estoppel" when the deadline for the welfare department to seek rehearing passes, or upon the finality of any appeals of the administrative hearing decision. (*Sims, supra,* 32 Cal.3d at pp. 485–486.)

Finally, we concluded in *Sims* that the county and the district attorney were in privity, as is required for collateral estoppel to apply. Although there is " 'no universally applicable definition of privity' " (*Sims, supra,* 32 Cal.3d at p. 486, quoting *Lynch v. Glass* (1975) 44 Cal.App.3d 943, 947 [119 Cal.Rptr. 139]), we explained that whether privity exists depends upon whether the " 'relationship between the party to be estopped and the unsuccessful party in the prior litigation . . . is "sufficiently close" so as to justify application of the doctrine of collateral estoppel.' " (32 Cal.3d at pp. 486–487, quoting *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 875 [151 Cal.Rptr. 285, 587 P.2d 1098].)

In discussing whether privity existed, we examined the relationship between "the district attorney's office, which represents the party to be estopped, and the County, the unsuccessful party in the prior litigation . . . ." (*Sims, supra,* 32 Cal.3d at p. 487.) Both entities, we noted, are county agencies that are designated by statute to represent the interests of the State of California; just as the district attorney's office represents the state in criminal matters (Pen. Code, § 684), the county welfare department acts for the state in administrative proceedings related to welfare benefits. (Welf. & Inst. Code, § 10800.) Entities that are " 'agents of the same government' " are generally found to be in privity, because they are both acting to vindicate the rights of the same governmental entity. (*Sims, supra,* 32 Cal.3d at p. 487.)

The *Sims* decision additionally recognized the "close association between the County and the district attorney's office" in cases involving alleged benefit overpayments and welfare fraud. (*Sims, supra,* 32 Cal.3d at p. 487.) We explained that the district attorney and the county "operate jointly in investigating and controlling welfare fraud," and that a special unit had been created "to investigate suspected welfare fraud and to function as a liaison between the County and law enforcement agencies." (*Ibid.*) We also noted that the county must provide documentary evidence to the district attorney upon request, and that county officials must be available to appear at criminal hearings and trials. The *Sims* decision also mentioned that "[i]n addition, an attempt by the County to obtain restitution of overpayments made to a welfare recipient suspected of fraud is sufficient to satisfy the mandate of section 11483 that the district attorney seek restitution before commencing criminal proceedings." (*Id.* at p. 488.) In view of the integrated relationship between the county and the district attorney in controlling welfare fraud, this court found in *Sims* that the county and the district attorney were in privity for purposes of applying collateral estoppel.

Having concluded that the traditional requirements of collateral estoppel were satisfied, we then examined whether precluding the district attorney from prosecuting the welfare recipient would further the traditional public policies served by the collateral estoppel doctrine. We noted in *Sims* that the application of collateral estoppel to bar criminal prosecutions of welfare fraud would further several public policy goals. First, we observed that "[g]iving conclusive effect to the [administrative] decision exonerating respondent of welfare fraud would promote judicial economy by minimizing repetitive litigation." (*Sims, supra,* 32 Cal.3d at p. 488; see also *Gikas v. Zolin* (1993) 6 Cal.4th 841, 849 [25 Cal.Rptr.2d 500, 863 P.2d 745].) Additionally, we expressed concern that, unless the later prosecutions were estopped, the possibility of inconsistent judgments could undermine the integrity of the judicial system as well as the integrity of the administrative hearing process; if a welfare recipient is found in an administrative hearing to have lawfully received welfare benefits, and then is successfully prosecuted in criminal court for welfare fraud, both decisions become suspect. (*Sims, supra,* 32 Cal.3d at p. 488.)

The possibility of having to defend the receipt of welfare benefits in two forums also works a hardship on the welfare recipient; if collateral estoppel does not apply, the welfare recipient cannot rely upon success at the administrative hearing because "he or she may still be required to return the benefits" after a criminal prosecution. (*Sims, supra,* 32 Cal.3d at p. 489.) Finally, we explained that precluding the district attorney from relitigating the issue of welfare fraud would protect welfare recipients from being harassed by repeated litigation. After receiving a judgment at the administrative hearing that the county did not satisfactorily prove that the welfare recipient

wrongly received welfare benefits, we commented that it would be "manifestly unfair" to subject her to a second proceeding in criminal court "in which she must defend herself against the very same charges of misconduct." (*Ibid.*)

As additional support for the conclusion that the application of collateral estoppel would further the public policy considerations served by the doctrine as a whole, we observed that "[i]n addition to the public policy considerations . . . the uniqueness of the statutory scheme governing prosecutions for [welfare] fraud and the circumstances of the individuals receiving welfare benefits make application of collateral estoppel particularly appropriate . . . ." (*Sims, supra,* 32 Cal.3d at p. 489.)

■ Principles of stare decisis present a formidable obstacle to the People's request that we reconsider our decision in *Sims,* which has been the law for nearly 25 years: "It is, of course, a fundamental jurisprudential policy that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justices. This policy, known as the doctrine of stare decisis, 'is based on the assumption that certainty, predictability and stability in the law are the major objectives of the legal system; i.e., that parties should be able to regulate their conduct and enter into relationships with reasonable assurance of the governing rules of law.' " (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 296 [250 Cal.Rptr. 116, 758 P.2d 58], quoting 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 758, p. 726.) Although we recognize that "reexamination of precedent may become necessary when subsequent developments indicate an earlier decision was unsound, or has become ripe for reconsideration" (*Moradi-Shalal, supra,* 46 Cal.3d at p. 297), the arguments posed by the People do not convince us that a reexamination of our decision in *Sims* is warranted.

The People first argue that our decisions subsequent to *Sims* place in doubt our characterization of the district attorney as essentially a "county agency," and therefore have undercut our holding in *Sims* that the district attorney and the county are in privity. This argument is based upon a false premise. Our decision in *Sims* did not characterize the district attorney as a county agency but, to the contrary, emphasized that the district attorney acts as an agent of the *state* in prosecuting welfare fraud: "The district attorney's office represents the State of California in the name of the 'People' at criminal prosecutions." (*Sims, supra,* 32 Cal.3d at 487.) It was precisely the district attorney's action as a surrogate for the state, combined with the county's

work as an " 'agent' of the state" (*ibid.*), that weighed in support of our conclusion that the district attorney and the county were in privity. We have not, as the People contend, "re-examined" the role of the district attorney's office; this court relied in *Sims* upon the district attorney's role as a representative of the state, and continues to recognize that criminal prosecutions are brought on behalf of the People of the State of California, whether by a county district attorney or by the Attorney General. (See *Pitts v. County of Kern* (1998) 17 Cal.4th 340, 345 [70 Cal.Rptr.2d 823, 949 P.2d 920] [holding that "the district attorney represents the state, not the county, . . . when prosecuting crimes"]; *People v. Eubanks* (1997) 14 Cal.4th 580, 588–589 [59 Cal.Rptr.2d 200, 927 P.2d 310].)

The People further argue that amendments to section 11483 made over 20 years ago place in doubt our conclusion in *Sims* that welfare fraud is governed by a "unique statutory scheme which established a preference for the noncriminal resolution of cases" and have "made more evident the Legislature's intent that the district attorney prosecute welfare fraud as a criminal violation." We disagree. As explained below, our observation in *Sims* that the statutes governing welfare fraud evidenced a unique preference for noncriminal resolution was not a linchpin of that decision; the statutory scheme merely offered additional, but nonessential, support for our holding. Further, even if we assume that the now decades-old changes to section 11483, upon which the People rely, removed the legislative preference for restitution, such changes do not establish a preference for criminal prosecution, but rather leave the government free either to seek restitution first or prosecute first.

Section 11483 prescribes criminal penalties for persons who have fraudulently obtained welfare benefits in amounts greater than $2,000.[2] At the time of *Sims*, the statute incorporated by reference to sections 12250 and 12850 the requirement that "restitution shall be sought . . . prior to the bringing of a criminal action." The purpose of this requirement was, in the words of the Court of Appeal, " 'that the person accused of fraud should be given an opportunity to make restitution, and if restitution is made, then the prosecutor should be required to reconsider the case in light of the fact that restitution has been made to determine whether prosecution is in fact warranted.' " (*People v. Preston* (1996) 43 Cal.App.4th 450, 454 [50 Cal.Rptr.2d 778], quoting *People v. Jordan* (1978) 86 Cal.App.3d 529, 535 [150 Cal.Rptr. 334].) In *People v. McGee* (1977) 19 Cal.3d 948 [140 Cal.Rptr.

---

[2] Section 11483 provides in pertinent part: "[W]henever any person has, by means of false statement or representation or by impersonation or other fraudulent device, obtained aid for a child not in fact entitled thereto, the person obtaining such aid shall be subject to prosecution . . . ." In cases involving an amount less than $2,000, section 11483 requires that "all actions necessary to secure restitution shall be brought."

657, 568 P.2d 382], this court held that the state's failure to comply with the statutory restitution requirement was grounds for dismissal of the criminal prosecution. (*Id.* at p. 966.)[3]

In 1984, as part of a reform of the statutes punishing welfare fraud, the Legislature amended section 11483 by replacing the reference to sections 12250 and 12850 with a reference to section 10980. Section 10980, which prescribes the penalties for various welfare-fraud-related offenses, does not require prosecutors to demand restitution of overpayments of more than $2,000 before criminal proceedings for welfare fraud may commence. (See *People v. Preston, supra,* 43 Cal.App.4th at p. 456; 2 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against Government Authority, § 152, p. 1243.) The Court of Appeal, in *People v. Preston,* held that the 1984 amendments "remove[d] any current statutory underpinning to the argument that the statute requires a prior demand for restitution." (*Preston, supra,* 43 Cal.App.4th at p. 460.) In doing so, the *Preston* court disagreed with an earlier Court of Appeal opinion, *People v. Camillo* (1988) 198 Cal.App.3d 981, 994 [244 Cal.Rptr. 286], that assumed that the 1984 amendments had not abrogated the requirement that the state seek restitution before pursuing criminal penalties.[4] (*Preston, supra,* 43 Cal.App.4th at p. 459.)

The People argue that the Legislature's enactment of the 1984 changes to the Welfare and Institutions Code undermined our decision in *Sims.* Prior to those statutory changes, the state could punish "welfare fraud" under at least seven different statutes that spanned the Welfare and Institutions Code and the Penal Code. (*People v. Preston, supra,* 43 Cal.App.4th at p. 456.) Consequently, "the same fraudulent act frequently violated several statutes, and was chargeable under more than one of these statutes." (*Ibid.*) The statutory changes were enacted to resolve the confusion and unnecessary filing of complaints that had resulted from the prior statutory framework. (Sen. Com. on Health & Human Services, Analysis of Sen. Bill No. 2171 (1983–1984 Reg. Sess.) as introduced Feb. 17, 1984.) "The purpose of section 10980 was to create administrative efficiencies in investigating and prosecuting fraud cases by creating a specific welfare fraud statute under which a

---

[3] Prior to *Sims,* the Legislature repealed sections 12250 and 12850, but section 11483 still referred to those repealed sections. This court held in *McGee* that the reference in section 11483 to those statutes therefore remained effective, and continued to direct that the state must pursue administrative remedies before criminal prosecution. (*People v. McGee, supra,* 19 Cal.3d at p. 958, fn. 3.)

[4] Both the People and defendant presuppose that the *Preston* court correctly concluded that the Legislature abrogated the requirement that the state first seek restitution, and neither party argues that the state is required to seek restitution prior to commencing criminal proceedings. Accordingly, we assume for purposes of argument, but do not decide, that the 1984 changes to section 11483 eliminated the requirement that the state must pursue restitution before criminal prosecution.

single fraudulent act involving more than one welfare program could be prosecuted. . . . [¶] . . . [¶] The remaining, and current, text of section 11483 does not contain any criminal proscriptions, but merely requires that restitution be sought in cases of failure to report not more than $2,000 in income or resources . . . ." (*Preston, supra,* 43 Cal.App.4th at p. 456.)

As noted above, the People contend that these statutory changes indicate that the Legislature no longer prefers that cases involving possible welfare fraud be resolved without resort to criminal prosecution, and that such a shift in legislative purpose implicitly overrules this court's decision in *Sims.* We reject this contention for two reasons. Even if the restitution-first requirement indicates a preference for noncriminal resolutions, it does not necessarily follow that the repeal of the requirement evinces a preference for criminal resolutions. Rather, the current statutory scheme instead places the criminal and noncriminal options in equipoise, leaving the County free to obtain restitution before, during, or after instituting criminal proceedings.[5]

Additionally, though the existence of a restitution-first requirement was considered by this court in *Sims,* it was only one factor in a multifactor analysis, and was alluded to only *in addition* to numerous other public policy reasons supporting our conclusion that privity existed between the district attorney and the county. Rather, as we have noted, the court in *Sims* primarily relied upon the sharing of information between the county and law enforcement agencies and "the fact that both entities are county agencies representing the state" in holding that collateral estoppel principles should apply. (*Sims, supra,* 32 Cal.3d at p. 488.) The People do not contend that the 1984 changes to the Welfare and Institutions Code altered the sharing of information between the County and the district attorney, nor do they point to any authority that would cause us to reconsider our characterization of the close relationship between the County and the district attorney.

The People argue our subsequent decision in *Lucido, supra,* 51 Cal.3d 335, demonstrates that the restitution-first requirement was essential to the outcome in *Sims.* But a careful reading of *Lucido* leads to the opposite conclusion. The restitution-first requirement was *one* basis for our decision in *Sims,* but far from the *only* grounds for our decision.

---

[5] We express no opinion on whether the DSS's current regulatory scheme indicates a preference for criminal resolution of welfare fraud cases. The parties have not raised or briefed the court on this issue, nor have they addressed whether the pertinent regulations were in place at the time *Sims* was decided by this court.

In *Lucido*, we held that the doctrine of collateral estoppel does not bar the People from relitigating in a criminal proceeding an issue on which the defendant had prevailed in a prior probation revocation hearing. (*Lucido*, *supra*, 51 Cal.3d at p. 339.) The defendant in *Lucido*, after being convicted of indecent exposure, was sentenced to probation. While on probation, he was charged with a new count of indecent exposure. The People sought to have Lucido's probation revoked based upon the indecent exposure, as well as upon the independent ground that Lucido had tested positive for marijuana use. Following a hearing, the court revoked Lucido's probation based only upon the marijuana use, and not upon the indecent exposure charge, stating that the prosecution had not produced clear and convincing evidence of the indecent exposure. (*Id.* at pp. 339–341.)

We held that the state was not collaterally estopped from prosecuting Lucido for indecent exposure, even though the state had failed to prove a violation of probation based on the same conduct. (*Lucido*, *supra*, 51 Cal.3d 335, 351.) In so holding, we followed the estoppel framework set forth and applied in *Sims*, including an analysis of whether the threshold requirements and traditional policy reasons for applying collateral estoppel were satisfied. (*Id.* at pp. 341–343.)

Our decision in *Lucido* discussed *Sims* on two occasions. First, we determined that *Sims* had not nullified an earlier decision, *Chamblin v. Municipal Court* (1982) 130 Cal.App.3d 115 [181 Cal.Rptr. 636], in which the Court of Appeal held that findings from a probation revocation hearing did not bar prosecution for Vehicle Code violations, stating: "In *Sims* we noted that the 'particular and special circumstances' presented by the 'unique statutory scheme' for resolution of welfare fraud strongly supported a holding that collateral estoppel should apply." (*Lucido*, *supra*, 51 Cal.3d at p. 345, quoting *Sims*, *supra*, 32 Cal.3d at pp. 489–490.) As noted above, the hearing in *Sims* was statutorily required to be held prior to any criminal action on the fraud. (*Sims*, *supra*, at p. 475, citing § 11483.) This requirement suggested that the Legislature intended to afford some protection from criminal prosecution for welfare recipients, and "supported our conclusion that collateral estoppel preempted a criminal trial if fraud was not proved at the hearing." (*Lucido*, *supra*, 51 Cal.3d at p. 345.)

We noted that *Chamblin* had reached the same conclusion, but the lower court in *Lucido* had declined to follow the decision in *Chamblin*, concluding that it had "been 'nullified sub silentio' by *Sims*." (*Lucido*, *supra*, 51 Cal.3d at p. 344.) We explained that *Chamblin* had not been nullified, because the

decisions in *Chamblin* and *Sims* "do not necessarily conflict," noting that "the 'unique statutory scheme' for resolution of welfare fraud strongly supported a holding that collateral estoppel should apply." (*Id.* at p. 345.) The statutory requirement present in *Sims* that the administrative hearing be held prior to any criminal prosecution "suggested that the Legislature intended to afford some protection from criminal prosecution for welfare recipients, by virtue of their 'minimal standard of living.' " (*Ibid.*) We observed that "[t]his interest was not present in *Chamblin*, and is not present here." (*Ibid.*, fn. omitted.)

Having distinguished the decisions in *Chamblin* and *Sims* and explained why our decision in *Sims* had not weakened the Court of Appeal's earlier decision in *Chamblin*, we held in *Lucido* that our earlier holding in *Sims* did not require us to apply collateral estoppel in the context of probation revocation hearings because we have applied collateral estoppel to preclude criminal trials "only when compelling public policy considerations outweighed the need for determinations of guilt and innocence to be made in the usual criminal trial setting." (*Lucido, supra,* 51 Cal.3d at p. 349.) Deciding that *Sims* did not compel this court to apply collateral estoppel to the probation revocation setting, we observed that "[i]n *Sims* . . . we applied collateral estoppel partly on the ground that the 'unique statutory scheme' at issue was intended to essentially resolve issues of criminal guilt and innocence in regard to welfare fraud." (*Ibid.,* italics omitted.)

Missing from each discussion of *Sims* was any statement or implication that we would have decided *Sims* differently had the former statutory scheme for resolution of welfare fraud been different. We simply relied upon the unique statutory scheme considered in *Sims* as a ready means of distinguishing the decision in *Chamblin*, and observed that the restitution-first requirement and the goal it furthered "supported" our holding in *Sims*. (*Lucido, supra,* 51 Cal.3d at p. 345.) Indeed, the discussion in *Lucido* noted that the *Sims* court "applied collateral estoppel *partly on the ground*" that the restitution-first requirement evinced a legislative intent "to essentially resolve issues of criminal guilt" in an administrative setting. (*Id.* at p. 349, italics added.) The other multiple bases for our decision in *Sims* remain untouched by our decision in *Lucido*.

The change in the statutory scheme governing welfare fraud to permit, rather than require, administrative proceedings seeking restitution of welfare benefits prior to criminal prosecution does not alter our conclusion that our decision in *Lucido* is consistent with our decision in *Sims*. For example, the circumstances in *Lucido* did not raise the concern expressed in *Sims* that

forcing welfare recipients to respond to criminal charges after an administrative law judge found that no overpayment was made or that no fraud occurred would impose a hardship on them and leave them exposed to being "harassed by repeated litigation." (*Sims, supra,* 32 Cal.3d at p. 489.) Rather, as we explained in *Lucido*, "[t]he essence of vexatiousness, however, is not mere repetition. Rather, it is harassment through baseless or unjustified litigation. [Citation.] Petitioner does not assert that the criminal proceedings in this case are intended to harass. The public has a legitimate expectation that a person once found guilty of a crime may both be held to the terms of his probation and (if deemed appropriate by the prosecution) tried anew for any offenses alleged to have been committed during the probationary period. For this reason, it is neither vexatious nor unfair for a probationer to be subjected to both a revocation hearing and a criminal trial." (*Lucido, supra,* 51 Cal.3d at p. 351.)

Further, we noted in *Lucido* that the existence of evidentiary rules rendering the probationer's testimony at the revocation hearing inadmissible at a subsequent criminal trial "significantly protect[s] probationers from prejudice caused by the juxtaposition of revocation hearings and criminal trials," and therefore weighed against the application of collateral estoppel. (*Lucido, supra,* 51 Cal.3d at p. 351.) This was not so in *Sims.* As the People conceded at argument, no similar evidentiary rules prohibit a welfare recipient's testimony at an administrative hearing from being introduced at a later criminal trial for welfare fraud.

Finally, different public policy concerns affected the decisions in *Sims* and *Lucido.*[6] In *Lucido*, we noted that the probation revocation hearing "arises as a continuing consequence of the probationer's original conviction" (*Lucido, supra,* 51 Cal.3d at p. 348), that any sanction imposed at the hearing stems

---

[6] The concurring and dissenting opinion relies heavily upon the decision in *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229], in which this court held that "a private arbitration award, even if judicially confirmed, may not have nonmutual collateral estoppel effect under California law unless there was an agreement to that effect in the particular case." (*Id.* at p. 824.) In failing to even cite *Vandenberg*, the People evidently do not view that decision as providing a tenable basis for reconsidering *Sims.* Nor do we.

Among other things, *Vandenberg* involved an insurance coverage dispute between two insurance companies that was presided over by a private arbitrator who was "not strictly bound by evidence, law, or judicial oversight." (*Vandenberg v. Superior Court, supra,* 21 Cal.4th at p. 833.) Unlike a private arbitration, in which parties effectively "bypass the judicial system" in favor of private dispute resolution (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10 [10 Cal.Rptr.2d 183, 832 P.2d 899]), the public administrative hearing at issue here and in *Sims* is "a judicial-like adversary proceeding" (*Sims, supra,* 32 Cal.3d at pp. 479–480) that is conducted by a state entity, the DSS, whose administrative law judges must follow California law and render decisions subject to judicial review. (See § 10962.) And in contrast to typical private arbitrations, DSS administrative hearings involve the government as a party and seek to resolve a matter of public concern, i.e., the alleged overissuance of public funds. We are not persuaded that the decision in *Vandenberg* warrants reconsideration of our decision in *Sims.*

from the fact that the probationer has been judged guilty of a prior crime, and that the subject of the revocation hearing is whether the defendant can safely remain at liberty. (*Id.* at pp. 347–348.) *Sims* did not arise from an earlier determination of culpability, and involved a welfare recipient—not a convicted criminal.

We noted in *Lucido* that "[p]robation revocation hearings and criminal trials serve different public interests." (*Lucido, supra,* 51 Cal.3d at p. 347.) "Probation is a form of leniency which is predicated on the notion that a defendant, by proving his ability to comply with the requirements of the law and certain special conditions imposed upon him, may avoid the more severe sanctions justified by his criminal behavior. Once given the opportunity for lenient treatment the choice is his as to whether he merits being continued on probation." (*People v. Zuniga* (1980) 108 Cal.App.3d 739, 743 [166 Cal.Rptr. 549].) We stated in *Lucido*: "A probation revocation hearing assesses whether conditions relating to punishment for a prior crime have been violated so that probation should be modified or revoked . . . ." (*Lucido, supra,* 51 Cal.3d at pp. 347–348.) In essence, the issue at a probation revocation hearing is whether the defendant's conduct demonstrates that the leniency extended by the grant of probation remains justified. By contrast, we noted in *Lucido,* "a criminal prosecution seeks conviction for wholly new offenses." (*Id.* at p. 348.)

■ *Sims* differs from *Lucido* in this respect, because the purposes of administrative proceedings seeking restitution of welfare benefits do not differ greatly from the purposes of criminal prosecution for welfare fraud in obtaining those same benefits. As we noted in *Sims,* "[t]he County had an adequate opportunity at the fair hearing to prove that respondent had fraudulently obtained welfare benefits. However, [Sims] successfully demonstrated her innocence." (*Sims,* supra, 32 Cal.3d at p. 489.)

■ Our conclusion that *Sims* remains vital after the 1984 changes to the welfare fraud scheme is supported by the legislative history of those changes, which reveals that the Legislature did not contemplate abrogating *Sims,* either as a direct or indirect effect of the 1984 statutory changes that resulted in, among other things, removing the restitution-first requirement. "[W]hen, as here, the Legislature undertakes to amend a statute which has been the subject of judicial construction" "it is presumed that the Legislature was fully cognizant of such construction . . . ." (*Palos Verdes Faculty Assn. v. Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659 [147 Cal.Rptr. 359, 580 P.2d 1155]; see also *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563,

572 [88 Cal.Rptr.2d 19, 981 P.2d 944]; *People v. Davenport* (1985) 41 Cal.3d 247, 263, fn. 6 [221 Cal.Rptr. 794, 710 P.2d 861].) Because the Legislature amended the welfare fraud statutes after this court's decision in *Sims* became final, we assume that the Legislature was aware of this court's construction of the welfare fraud statutes in that case. Had the Legislature wanted to invalidate *Sims*, it could have provided that no administrative decision would prevent a prosecution for welfare fraud.

██ The Legislature has demonstrated the ability, when it so intends, to specify that administrative proceedings will not bar judicial proceedings. For example, the Legislature specifically provided that administrative proceedings before the Department of Motor Vehicles could not have "a preclusive effect on related criminal proceedings." (*Gikas v. Zolin, supra*, 6 Cal.4th at p. 851.) The Legislature did not incorporate such a provision denying preclusive effect to administrative hearings in cases of suspected welfare fraud; indeed, the Legislature rejected a bill that contained such language, in favor of legislation that did not directly implicate *Sims*.[7]

Finally, the People raise for the first time in their opening brief in this court, the argument that the enactment of Proposition 115 in 1990 compels this court to reconsider our decision in *Sims*. Among other things, Proposition 115 added to the California Constitution a provision that provides the People of California with the right to "a speedy and public trial." (Cal. Const., art. I, § 29.) The People argue that "the creation of an express constitutional right in the People to a public trial compels rejection of the pre-1990 rule that the county's failure in an administrative hearing operates to deprive the People of the right to try the issue of fraud and perjury in a criminal proceeding." In support of the argument that administrative hearings do not satisfy the People's right to a public trial, the People note that administrative regulations

---

[7] Senate Bill No. 962 (1983–1984 Reg. Sess.), which was introduced at roughly the same time as Senate Bill No. 2171 (1983–1984 Reg. Sess.), proposed to introduce the following language into the Welfare and Institutions Code: "Nothing in this chapter, including any administrative decision, shall be construed so as to prevent the prosecution of an applicant or recipient for a criminal violation of Section 396 of the Penal Code, or the crime of perjury, as defined in Section 188 of the Penal Code." (Sen. Bill No. 962 (1983–1984 Reg. Sess.) Mar. 3, 1983.)

This provision of Senate Bill No. 962 was intended to "repeal the *Sims* decision by providing that no administrative decision would prevent the prosecution of an applicant or recipient for criminal violation of the welfare fraud provision." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 962 (1983–1984 Reg. Sess.) as amended Apr. 21, 1984, p. 12.) The Legislature, however, did not enact Senate Bill No. 962. Rather, the Legislature modified the welfare fraud statutes by enacting into law Senate Bill No. 2171, which did not contain a provision preventing the application of collateral estoppel principles to an administrative decision. However, as this court has previously noted, unpassed bills "have little value" in ascertaining legislative intent. (*People v. Mendoza* (2000) 23 Cal.4th 896, 921 [98 Cal.Rptr.2d 431, 4 P.3d 265].)

state that "[a]ttendance at the hearing is ordinarily limited to the claimant, authorized representative . . . county representative, legal counsel, authorized interpreter, and witnesses relevant to the issue." (DSS Manual of Policies & Procedures (May 12, 1995) ch. 22-000, § 22-049.1.)

The People thus assert that attendance at administrative hearings related to welfare benefit overpayment ordinarily is limited, but because they raise the issue for the first time before this court, they provide no showing that attendance at the hearing in this particular case was so limited as to render the hearing nonpublic, or that the procedures employed at the hearing in this case render it nonjudicial. Nor do the People cite any persuasive authority supporting their contention that Proposition 115's general provision regarding the People's right to a speedy and public trial was intended to overrule *Sims* or to more generally prevent the application of collateral estoppel principles. Indeed, the *Sims* regime does not foreclose the People from seeking a criminal trial prior to the administrative hearing; the hearing can only estop the issue of welfare fraud if the People do not pursue the criminal option as speedily as the County pursues the matter administratively.

The People also contend that, even if *Sims* remains vital after the statutory changes described above, collateral estoppel should not act to bar the prosecution of defendant in this particular case, because the Court of Appeal erred in finding that the issues actually litigated in the administrative hearing were identical to the issues in the criminal prosecution.[8]

As noted above, the first of the traditional requirements of collateral estoppel is that the issue to be precluded must be identical to that decided in the prior proceeding. (*Sims, supra,* 32 Cal.3d at p. 484.) The Court of Appeal in the present case determined what issues had been litigated in the administrative hearing by considering what issues had been " '*properly raised,* by the pleadings or otherwise,' " and whether those issues had been " 'submitted for determination, and . . . *determined.*' " (*Ibid.*) The Court of Appeal relied upon the fact that "[t]he administrative decision identified the issues subject to determination as (1) whether defendant's two sons were members of her household when she received aid on their behalf, and (2) whether she

---

[8] The concurring and dissenting opinion complains that our holding that our decision in *Sims* survives statutory changes and intervening judicial decisions is dictum. We disagree. We granted review in this case to examine the People's contention that *Sims* is no longer good law in light of the 1984 statutory changes and our 1990 decision in *Lucido.* The concurring and dissenting opinion contends that the court should dispose of this case by finding that the threshold requirements for collateral estoppel have not been met here. (Conc. & dis. opn. of Chin, J., *post,* at p. 1095.) However, the concurring and dissenting opinion fails to recognize that we must first decide whether *Sims* remains effective after the statutory and other changes before turning to whether the requirements outlined in *Sims* apply to the facts of this particular case.

received relief to which she was not entitled because she 'fail[ed] to report the boys' absence from her home.' "

At issue in a prosecution for welfare fraud is whether a person has obtained aid for a child not entitled to assistance *"by means of* false statement or representation or by impersonation or other fraudulent device." (§ 11483, italics added.) However, the Court of Appeal did not adequately consider whether the administrative law decision actually determined whether defendant made any such misrepresentations or omissions and whether those misrepresentations or omissions caused, at least in part, the overpayments.

The administrative decision concluded that "all the overpayments and overissuances are determined to have been caused by administrative errors." But this does not foreclose the possibility that defendant misrepresented whether her two sons were members of her household when she received aid on their behalf and failed to report the boys' absence from her home. The administrative decision that the overpayments were caused by administrative errors leaves open the possibility that defendant made misstatements that were a contributing cause to the overpayments. It is possible that the administrative decision did not determine whether defendant made any misrepresentations, or whether such misrepresentations were a cause, but not the sole cause, of the overpayments. Only if the administrative law judge did indeed find that defendant had made no misrepresentations or omissions in her applications for aid would the state be barred from prosecuting her for welfare fraud; if defendant made no false representations, an element of that crime has not been satisfied. (*People v. Carlson* (1977) 76 Cal.App.3d 112, 116 [142 Cal.Rptr. 638].)

We decline to determine whether in the present case the People are collaterally estopped from prosecuting defendant for welfare fraud and, instead, remand the case to permit the Court of Appeal to resolve that issue in the first instance. In so doing, the Court of Appeal should consider the circumstance that the record on appeal does not include the notices of action issued by the County on January 16, 2001, in the administrative proceedings. Although we can deduce from the administrative decision that the notices alleged that defendant, rather than the County, was at fault for the overpayments, the absence of these notices from the record makes it difficult to determine what issues were raised " 'by the pleadings or otherwise' " (*Sims, supra,* 32 Cal.3d at p. 484) in the administrative hearing. On remand, the Court of Appeal should consider the effect, if any, of the absence of these documents from the record on appeal.

It is also unclear whether the People are collaterally estopped from prosecuting defendant for perjury. The Court of Appeal decision does not

discuss the perjury charge. The elements of perjury are: "a 'willful statement, under oath, of any material matter which the witness knows to be false.' " (*Cabe v. Superior Court* (1998) 63 Cal.App.4th 732, 735 [74 Cal.Rptr.2d 331]; see also *Chein v. Shumsky* (2004) 373 F.3d 978, 983.) Again, if the administrative decision actually decided that defendant had made no misstatements, collateral estoppel would bar prosecution of defendant for perjury. However, if defendant willfully made misstatements, but the administrative law judge determined that such misstatements were not the dominant cause of the overpayments, collateral estoppel would not necessarily dispose of the perjury charge, as it is possible that defendant's false representation could have been material to the administrative proceeding. (See *People v. Kobrin* (1995) 11 Cal.4th 416, 426–427 [45 Cal.Rptr.2d 895, 903 P.2d 1027].)

Accordingly, we remand this matter to the Court of Appeal for further proceedings consistent with this opinion, including a determination of whether the issues litigated at the administrative hearing and the criminal prosecution for welfare fraud and perjury were identical.

## III.  DISPOSITION

For the foregoing reasons, the judgment of the Court of Appeal is reversed; and the matter is remanded to the Court of Appeal for further proceedings consistent with this opinion, including reconsideration of whether the issues litigated at the administrative hearing and the criminal prosecution for welfare fraud and perjury were identical.

George, C. J., Kennard, J., Baxter, J., and Werdegar, J., concurred.


**CHIN, J.,** Concurring and Dissenting.—I agree with the majority that the Court of Appeal's judgment must be reversed because the record fails to demonstrate that in resolving the administrative proceedings before the California Department of Social Services, the administrative law judge (ALJ) necessarily determined that defendant Cathy Dawn Garcia did not make misrepresentations or omissions that contributed to her receipt of overpayments. (Maj. opn., *ante*, at pp. 1089–1090.) However, as explained below, I disagree with the majority's decision to remand the case to the Court of Appeal for further consideration of this question. (Maj. opn., *ante*, at p. 1091.) Because defendant bears the burden of proving her collateral estoppel claim and the record she has provided is insufficient to meet that burden, I would hold that her collateral estoppel claim fails; she simply has not established what the majority correctly identifies as the "threshold requirements" of collateral estoppel. (Maj. opn., *ante*, at p. 1077.)

I also do not join the majority's discussion of whether applying collateral estoppel under the circumstances here would be consistent with public policy.

The majority is reversing the Court of Appeal's judgment because of doubts that collateral estoppel's *threshold* requirements are met in this case. It is therefore both premature and unnecessary to decide whether, *assuming* the threshold requirements have been met, public policy considerations support collateral estoppel's application. Moreover, substantively, I disagree with the majority's analysis. In light of statutory developments since *People v. Sims* (1982) 32 Cal.3d 468 [186 Cal.Rptr. 77, 651 P.2d 321] (*Sims*), and our post-*Sims* decisions in *Lucido v. Superior Court* (1990) 51 Cal.3d 335 [272 Cal.Rptr. 767, 795 P.2d 1223] (*Lucido*), and *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229] (*Vandenberg*), were it necessary to decide the question, I would hold that public policy considerations do not support applying collateral estoppel in this case.

### I. DEFENDANT HAS FAILED TO ESTABLISH THE THRESHOLD REQUIREMENTS OF COLLATERAL ESTOPPEL.

As we recently explained, collateral estoppel "applies 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.]' " (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 943 [38 Cal.Rptr.3d 220, 126 P.3d 1040].)

"The party asserting collateral estoppel bears the burden of establishing these [threshold] requirements. [Citation.]" (*Lucido, supra,* 51 Cal.3d at p. 341.) Because "the law does not favor estoppels" (*People v. Frank* (1865) 28 Cal. 507, 517 (*Frank*)), this burden is a heavy one. As we have explained, "[c]ertainty is an essential element of every estoppel . . . ." (*Oakland v. Oakland Water Front Co.* (1897) 118 Cal. 160, 221 [50 P. 277].) Thus, where a party asserts "a certain question in issue has been litigated and determined between the same parties in a previous action, it is not enough that the proposed evidence tends to show that the precise question may have been involved in such litigation." (*Emerson v. Yosemite Gold Min. etc. Co.* (1906) 149 Cal. 50, 57 [85 P. 122].) In other words, " '[e]very estoppel must be certain to every intent, and not to be taken by argument or inference.' [Citation.] 'If upon the face of a record anything is left to conjecture as to what was necessarily involved and decided, there is no estoppel in it when pleaded, and nothing conclusive in it when offered in evidence.' [Citation.]" (*Beronio v. Ventura County Lumber Co.* (1900) 129 Cal. 232, 236 [61 P. 958].)

These rules take on special significance where the decision asserted as an estoppel may have been based on several alternative grounds. " '[I]f it appear[s] that several distinct matters may have been litigated' " in the prior action, " 'upon one or more of which the judgment may have passed,' " unless the record clearly indicates " 'which of them was thus litigated, and upon which the judgment was rendered,' " collateral estoppel does not apply. (*Horton v. Goodenough* (1920) 184 Cal. 451, 461 [194 P. 34].) Thus, collateral estoppel does not apply if "it is impossible to determine from the evidence offered in support of the estoppel" which of several potentially dispositive issues the prior decision was "founded upon." (*Frank, supra*, 28 Cal. at p. 516.)

Under these principles, defendant's collateral estoppel claim fails. As the majority correctly explains, the ALJ's determination here that the overpayments "were caused by administrative errors leaves open the possibility that defendant made misstatements that were a contributing cause to the overpayments." (Maj. opn., *ante*, at p. 1090.) Indeed, this is precisely what the trial court concluded in rejecting defendant's collateral estoppel claim. Based on the ALJ's decision, the trial court concluded that the ALJ's "causation finding" simply represents a "qualitative comparison between the things the county did and the things the defendant did" and "does not carry with it an implicit finding that there was no error in reporting." Supporting this conclusion are the ALJ's findings that "[t]he county welfare department was not fully apprised of the actual circumstances surrounding which parent had primary responsibility for the care and control of" defendant's children and that "the likelihood of overpayments" would merely have been "diminished"—not eliminated—had the county welfare department properly "reviewed the [children's] living arrangement in September 1998." In light of these findings, the trial court correctly concluded the ALJ made no finding that misstatements by defendant did not contribute to the overpayments.

The majority also correctly explains that the absence in the record of the notices of action "makes it difficult to determine" precisely what issues were before and decided by the ALJ. (Maj. opn., *ante*, at p. 1090.) Notably, at oral argument, defendant's counsel conceded that "it's a difficult record to read" because "all" of the information and documents "weren't entered into evidence at the criminal trial." Indeed, in her brief, defendant explains that the only evidence she produced below in support of her collateral estoppel claim was a copy of the ALJ's decision. Under the governing law as set forth above, because defendant bears the burden of proving the elements of collateral estoppel, the absence from the record of the notices is her responsibility and the failure of the incomplete record to clarify the scope of the ALJ's decision requires rejection of her collateral estoppel claim. (Cf. *Vella v. Hudgins* (1977) 20 Cal.3d 251, 258 [142 Cal.Rptr. 414, 572 P.2d 28]

[rejecting res judicata claim where "sparse record presented . . . fail[ed] to show either the precise nature of the factual issues litigated, or the depth of the court's inquiry"].)

I disagree with the majority's view that we should remand the case to the Court of Appeal to "consider the effect, if any, of the absences of [the notices of action] from the record . . . ." (Maj. opn., *ante*, at p. 1090.) As demonstrated above, by placing the burden on the party alleging collateral estoppel to prove with certainty that a particular issue was decided in the prior proceeding, and by rejecting the doctrine's application where the record fails to demonstrate which of several potentially dispositive issues the prior decision was based on, our decisions clearly specify "the effect" of the record's incompleteness (*ibid.*): defendant's collateral estoppel claim should be rejected. Because the majority correctly concludes that, on the record before us, the ALJ's determination leaves open the possibility that "defendant made misstatements that were a contributing cause to the overpayments" (*ibid.*), under the governing cases, there is nothing left for the Court of Appeal to consider. Notably, although the majority directs the Court of Appeal on remand to "consider the effect, if any, of the absences of [the notices of action] from the record" (*ibid.*), the majority gives the Court of Appeal no guidance as to what it is supposed to do with this information. Rather than remand for further consideration of this issue, we should simply affirm the trial court's rejection of defendant's collateral estoppel claim and its denial of her dismissal motion.[1]

## II. Public Policy Considerations Do Not Support Applying Collateral Estoppel in This Case.

As explained above, collateral estoppel does not apply if the party asserting it fails to establish several "threshold" requirements. (*Lucido, supra*, 51 Cal.3d at p. 341.) We also refer to these threshold requirements as "prerequisites." (*Sims, supra*, 32 Cal.3d at p. 488.)

However, "even where the minimal prerequisites" are established, " ' "policy considerations may limit [collateral estoppel's] use where the . . . underpinnings of the doctrine are outweighed by other factors." ' [Citations.]" (*Vandenberg, supra*, 21 Cal.4th at p. 829.) In other words, California's collateral estoppel doctrine "has a public policy exception" (*People v. Santamaria* (1994) 8 Cal.4th 903, 917, fn. 6 [35 Cal.Rptr.2d 624, 884 P.2d 81]) that precludes the doctrine's application, even where the threshold

---

[1] I would, however, remand to the Court of Appeal for consideration of other issues that defendant raised and the Court of Appeal did not address in light of its conclusion that collateral estoppel applies.

requirements are met, if the "policy reasons for applying collateral estoppel" are not "satisfied by the facts of [the] case." (*Sims, supra,* 32 Cal.3d at p. 477.)

For several reasons, I do not join the majority's discussion of the public policy exception's application in this case. Initially, the discussion is both premature and unnecessary. As I have explained, defendant has failed to establish the threshold requirements of her collateral estoppel claim. In reversing the Court of Appeal's judgment, the majority agrees that the threshold requirements of the doctrine may not be met in this case. (Maj. opn., *ante,* at pp. 1089–1091.) Unless and until it is determined that defendant has established the *threshold* requirements, it is unnecessary to discuss whether the public policy *exception* to the collateral estoppel doctrine applies on the facts of this case. The majority improperly inverts the analysis, by first discussing whether the public policy *exception* applies, and then, as if by afterthought, discussing whether the *threshold* requirements have even been established. This analytical inversion cannot hide the fact that the majority's conclusion regarding the *threshold* question—that defendant may have failed to establish the *prerequisites* of her collateral estoppel claim—and its *reversal* of the Court of Appeal's judgment on this basis make it unnecessary to address the applicability of the public policy exception. Thus, the majority's discussion is dictum.[2] (See *People v. Pearson* (1986) 42 Cal.3d 351, 358 [228 Cal.Rptr. 509, 721 P.2d 595] [discussion of issue that might arise on remand "was essentially dictum" where court "determined that the judgment would be reversed on other grounds"]; *People v. Mendoza* (2000) 23 Cal.4th 896, 914 [98 Cal.Rptr.2d 431, 4 P.3d 265] [where conviction was reversed because of erroneous exclusion of evidence, discussion of other issues that might arise on retrial "was not necessary to . . . case's resolution"]; *Stockton Theatres, Inc. v. Palermo* (1956) 47 Cal.2d 469, 474 [304 P.2d 7] ["discussion or determination of a point not necessary to the disposition of a question that is decisive of the appeal is generally regarded as obiter dictum"].)

More fundamentally, I disagree with the majority's analysis of the issue. At the outset, it is important to note that the majority does not make an independent analysis of whether the relevant public policy considerations support application of collateral estoppel on the facts of this case. Nor does

---

[2] Contrary to the majority's suggestion, *Sims* did not first "outline[]" collateral estoppel's threshold requirements. (Maj. opn., *ante,* at p. 1089, fn. 8.) Those requirements were already well established when we decided *Sims,* as clearly evidenced by the fact that *Sims* merely quoted one of our earlier decisions in setting forth the requirements. (*Sims, supra,* 32 Cal.3d at p. 484, quoting *People v. Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622].) The majority is simply incorrect in asserting that we "must" determine whether *Sims*'s discussion of collateral estoppel's policy exception "remains effective" before we determine whether collateral estoppel's threshold requirements have even been met. (Maj. opn., *ante,* at p. 1089, fn. 8.)

the majority decide whether *Sims* was correctly decided. Instead, purporting to apply "[p]rinciples of stare decisis" (maj. opn., *ante*, at p. 1080), the majority simply considers whether "statutory and other changes" since *Sims* "warrant reconsideration of" that decision. (*Id.* at p. 1074.) Rather than focus almost exclusively on *Sims*, as does the majority, I also look to our subsequent decisions in *Lucido* and *Vandenberg*. Viewing those decisions in light of relevant statutory changes, I conclude that public policy considerations do not support application of collateral estoppel on the facts of this case.

Like the majority, I begin with *Sims*. There, we held that "collateral estoppel bar[red] the state from [criminally] prosecuting" a welfare recipient "for welfare fraud since she was exonerated in [an administrative fair] hearing of that charge." (*Sims, supra,* 32 Cal.3d at p. 489.) In analyzing that question, we first considered whether "the technical prerequisites for applying collateral estoppel . . . were satisfied." (*Id.* at p. 488.) After concluding that they were, we then considered whether "public policy considerations" supported the doctrine's application (*id.* at p. 489) on "the facts of [that] case." (*Id.* at p. 477.) We stated that applying the doctrine "would promote judicial economy by minimizing repetitive litigation" and would prevent "the possibility of inconsistent judgments which may undermine the integrity of the judicial system" and of "the [administrative] fair hearing process." (*Id.* at p. 488.) We next explained that not applying the doctrine would work "a hardship" on a welfare recipient "who presents a successful case at the fair hearing," by requiring the recipient, "[i]n planning a budget for limited resources, . . . to take into consideration that he or she may still be required to return the benefits" that were "found" in the administrative hearing to have been "legally obtained." (*Id.* at pp. 488–489.) Next, we stated that applying the doctrine "would protect [the defendant] from being harassed by repeated litigation." (*Id.* at p. 489.) It "would be manifestly unfair," we declared, "[t]o subject [the defendant] to a second proceeding in which she must defend herself against the very same charges of misconduct." (*Ibid.*) Finally, we stressed that "the uniqueness of the statutory scheme governing prosecutions for [welfare] fraud . . . ma[d]e application of collateral estoppel particularly appropriate in [that] case." (*Ibid.*) Specifically, we cited the fact that the statutes required the state to "seek restitution by request or civil action before initiating criminal proceedings in cases involving certain categories of [welfare] fraud." (*Ibid.*) By enacting this "restitution-first requirement" (maj. opn., *ante*, at p. 1083), we explained, "the Legislature establishe[d] a policy in favor of resolving [welfare] fraud cases outside the criminal justice system." (*Sims, supra,* 32 Cal.3d at p. 489.) Only by "ignor[ing]" this legislatively established policy, we reasoned, could we hold that collateral estoppel did not apply. (*Ibid.*) Based on this analysis, we concluded that collateral estoppel applied "[i]n the particular and special circumstances of [that] case." (*Ibid.*)

Eight years later, in *Lucido*, we again considered whether "collateral estoppel principles" may be invoked "to preclude criminal trials. [Citation.]" (*Lucido, supra*, 51 Cal.3d at p. 349.) There, based on a judicial finding in a probation revocation hearing that the state failed to prove an alleged criminal offense, the defendant argued that the state was collaterally estopped from criminally prosecuting him for that offense. (*Id.* at pp. 340–341.) After explaining that the defendant "arguably ha[d] fulfilled the threshold requirements" of collateral estoppel (*id.* at p. 341), we considered whether "the public policies underlying [the doctrine]—preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation"—warranted its application. (*Id.* at p. 343.) Regarding the first, we acknowledged that "[p]ublic confidence in the integrity of the judicial system is threatened whenever two tribunals render inconsistent verdicts. [Citation.]" (*Id.* at p. 347.) However, we then explained that "[c]onsistency . . . is not the sole measure of the integrity of judicial decisions" (*ibid.*), and that in this context, preserving the integrity of the judicial system requires "preserving the criminal trial process as the proper forum for determinations of criminal guilt or innocence." (*Id.* at p. 350, fn. 11.) In light of this concern, we explained, we have applied collateral estoppel principles to preclude criminal trials "only when compelling public policy considerations outweighed the need for determinations of guilt and innocence to be made in the usual criminal trial setting." (*Id.* at p. 349.) Regarding the second policy consideration—judicial economy—we stated that "the efficiencies of applying collateral estoppel . . . pale before the importance of preserving the criminal trial process as the exclusive forum for determining guilt or innocence as to new crimes." (*Id.* at p. 351.) Regarding the third policy consideration—vexatious litigation—after noting that "[t]he essence of vexatiousness . . . is harassment through baseless or unjustified litigation," "not mere repetition," we stated: "[The defendant] does not assert that the criminal proceedings in this case are intended to harass. The public has a legitimate expectation that a person once found guilty of a crime may both be held to the terms of his probation and (if deemed appropriate by the prosecution) tried anew for any offenses alleged to have been committed during the probationary period. For this reason, it is neither vexatious nor unfair for a probationer to be subjected to both a revocation hearing and a criminal trial. The People's failure to prevail at the revocation hearing does not alone transform the otherwise permissible subsequent trial into harassment." (*Ibid.*) We thus held that the finding at the defendant's probation revocation hearing did not collaterally estop the defendant's prosecution. (*Ibid.*)

As the majority notes (maj. opn., *ante*, at p. 1084), in *Lucido*, we expressly explained why *Sims* did not require a different result. We cited *Sims* as a case in which "compelling public policy considerations outweighed the need for

determinations of guilt and innocence to be made in the usual criminal trial setting." (*Lucido, supra,* 51 Cal.3d at p. 349.) The determinative policy consideration we identified was "the 'unique statutory scheme' at issue" in *Sims,* which expressed—through the restitution-first requirement—a "legislative determination" to "deemphasize[] the role of criminal trials in the overall scheme for resolution of welfare fraud cases." (*Lucido, supra,* 51 Cal.3d at pp. 349–350.) We then explained: "[B]ecause [of this] legislative determination," the "concern . . . about the overall integrity of the criminal trial process as the intended forum for determinations of guilt and innocence was less at issue in *Sims* . . . . In the present case, by contrast, the Legislature has not indicated a preference that questions of guilt or innocence on criminal charges be litigated in revocation hearings rather than at trial. For this reason, we decline in this context to follow *Sims's* conclusion that preservation of the integrity of either the judicial system as a whole or the hearing process itself warrants application of collateral estoppel. Similarly, we decline to attribute as much weight in this case as we did in *Sims* to a need to prevent inconsistent judicial determinations." (*Ibid.,* fn. omitted.)

In *Vandenberg,* this court held that a private arbitration award, even when judicially confirmed, "may not have nonmutual collateral estoppel effect under California law unless there was an agreement to that effect in the particular case." (*Vandenberg, supra,* 21 Cal.4th at p. 824, fn. omitted.) Regarding the relevant public policy considerations, the court reasoned that applying collateral estoppel in this context was not necessary either to preserve the integrity of the judicial system or to promote judicial economy. (*Id.* at p. 833.) As to the former, the court explained that "because a private arbitrator's award is *outside* the judicial system, denying the award collateral estoppel effect has no adverse impact on judicial integrity." (*Ibid.*) As to the latter, the court reasoned that "because private arbitration does not involve the use of a judge and a courtroom, later relitigation does not undermine judicial economy by requiring duplication of judicial resources to decide the same issue." (*Ibid.*)

Applying *Sims, Lucido,* and *Vandenberg* in light of the current statutory and administrative scheme, I conclude that public policy considerations do not support applying collateral estoppel on the facts of this case. Under *Vandenberg,* "because [an ALJ's decision at a fair hearing] is *outside* the judicial system, denying the award collateral estoppel effect has no adverse impact on judicial integrity." (*Vandenberg, supra,* 21 Cal.4th at p. 833.) Moreover, according to *Lucido,* the paramount policy concern in terms of the judicial system's integrity is "preserving the criminal trial process as the proper forum for determinations of criminal guilt or innocence." (*Lucido, supra,* 51 Cal.3d at p. 350, fn. 11.) *Lucido* establishes that this concern controls unless "outweighed" by "compelling public policy considerations." (*Id.* at p. 349.)

I find no such compelling policy considerations here. Concerns about judicial economy do not suffice. Under *Vandenberg*, "because [an administrative fair hearing] does not involve the use of a judge and a courtroom, later relitigation does not undermine judicial economy by requiring duplication of judicial resources to decide the same issue." (*Vandenberg, supra*, 21 Cal.4th at p. 833.) In any event, under *Lucido*, any concerns about judicial economy "pale before the importance of preserving the criminal trial process as the exclusive forum for determining guilt or innocence as to new crimes." (*Lucido, supra*, 51 Cal.3d at p. 351.) Nor do concerns about vexatious litigation suffice; as in *Lucido*, defendant here "does not assert that the criminal proceedings in this case [were] intended to harass." (*Ibid.*) Moreover, to quote *Lucido* in this context, "[t]he public has a legitimate expectation" that a welfare recipient "may both be held to the terms" of the welfare program in an administrative fair hearing held at the recipient's request "and (if deemed appropriate by the prosecution) tried . . . for any [criminal] offenses alleged to have been committed" in connection with the program. (*Ibid.*) "For this reason, it is neither vexatious nor unfair" for a welfare recipient who has requested an administrative fair hearing also "to be subjected to . . . a criminal trial." (*Ibid.*) Finally, the overriding public policy consideration that, according to *Lucido*, allowed us to apply collateral estoppel in *Sims*—the Legislature's decision, expressed through the restitution-first requirement, to "deemphasize[] the role of criminal trials in the overall scheme for resolution of welfare fraud cases" (*Lucido, supra*, 51 Cal.3d at p. 350)—no longer exists; as the parties agree and the majority "assume[s] for purposes of argument" (maj. opn., *ante*, at p. 1082, fn. 4), in 1984, the Legislature enacted changes to the relevant statutes that eliminated the restitution-first requirement. (*People v. Preston* (1996) 43 Cal.App.4th 450, 455–461 [50 Cal.Rptr.2d 778].)

Indeed, the statutory and administrative scheme that now governs indicates a *preference* for resolution of welfare fraud cases *through the criminal trial process.* The Welfare and Institutions Code provides that "whenever" a person fraudulently obtains aid, that person "shall be subject to prosecution." (Welf. & Inst. Code, § 11483.)[3] The regulations of the California Department of Social Services (DSS) provide that if an investigation uncovers sufficient evidence that a welfare recipient "intentionally . . . [¶] Made a false or misleading statement, or misrepresented, concealed, or withheld facts" (DSS Manual of Policies & Procedures (Feb. 8, 2005) §§ 20-300.1.11, 20-351i(1)(a) (hereafter MPP)), then a county *must* ask the prosecuting authority to issue a criminal complaint. (*Id.*, §§ 20-007.35, 20-300.21, 20-352.13.) While the prosecution is evaluating the case and "subsequent to any action taken against the accused individual by the prosecutor or court of the appropriate jurisdiction," a county may not hold an administrative hearing to

---

[3] All further unlabeled statutory references are to Welfare and Institutions Code.

determine whether the recipient engaged in such conduct. (*Id.*, §§ 20-300.24, 20-352.3.) Thus, whereas *Sims* found that application of collateral estoppel was "warranted . . . due to the unique statutory scheme which established a [legislative] preference for the noncriminal resolution of cases involving an accusation of welfare fraud" (*Sims, supra,* 32 Cal.3d at p. 490), the statutory and administrative scheme now in place indicates a preference for *criminal* resolution of such cases. For this reason, *Sims* does not govern here; instead, we should follow *Lucido* and hold that collateral estoppel does not apply in light of the public's paramount interest in "preserving the criminal trial process as the proper forum for determinations of criminal guilt or innocence." (*Lucido, supra,* 51 Cal.3d at p. 350, fn. 11.)

The majority makes several errors in concluding that there is no existing "preference for criminal resolutions" of welfare fraud cases. (Maj. opn., *ante,* at p. 1083.) Initially, the majority fails to consider the language of section 11483 that I have discussed above, which the People rely on in their brief. Moreover, the majority expressly declines to consider whether the "current regulatory scheme" speaks to this question, because the parties have not briefed the issue. (Maj. opn., *ante,* at p. 1083, fn. 5.) However, because *Sims* relied on the regulatory scheme in reaching its conclusion (*Sims, supra,* 32 Cal.3d at pp. 480–481, 487–488), the majority, in relying exclusively on *Sims,* necessarily is also relying on that scheme. In my view, we should not, as the majority implicitly does, rely only on part of the regulatory scheme; we should consider all of it. If the majority believes it cannot do so on the existing record, then it should either request further briefing or decline to decide whether the public policy exception applies; it should not purport to decide that issue based on an incomplete analysis that ignores an important consideration. Indeed, in addition to its conclusion that the *threshold* requirements of the collateral estoppel may not be met here, the majority's view that the record is insufficient to determine the impact of the regulatory scheme further demonstrates that it is premature to decide whether the public policy exception applies.[4]

---

[4] I also disagree with the majority's view that we cannot determine the relevance of the regulatory scheme without briefing on "whether the pertinent regulations were in place at the time *Sims* was decided by this court." (Maj. opn., *ante,* at p. 1083, fn. 5.) An administrative agency has no discretion to promulgate regulations that are inconsistent with governing statutes, and any such regulation is invalid. (*Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1029 [130 Cal.Rptr.2d 662, 63 P.3d 220]; *Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 269 [121 Cal.Rptr.2d 203, 47 P.3d 1069].) Because the preference for noncriminal resolution of welfare cases we relied on in *Sims* was established *by statute,* it would have overridden any contrary preference expressed in the administrative regulations at that time (which no doubt explains why *Sims* did not consider this question). Thus, contrary to the majority's view, it is irrelevant whether "the pertinent regulations were in place at the time *Sims* was decided . . . ." (Maj. opn., *ante,* at p. 1083, fn. 5.)

Even were the statutes and regulations silent on the point, as explained above, *Lucido* is not. In this regard, although the majority purports to be concerned with "[p]rinciples of stare decisis" (maj. opn., *ante*, at p. 1080), it fails even to consider—much less give any weight to—the paramount public policy consideration we identified and based our decision on in *Lucido*: "preserving the criminal trial process as the proper forum for determinations of criminal guilt or innocence." (*Lucido*, *supra*, 51 Cal.3d at p. 350, fn. 11.) The majority does not explain why this consideration does not apply here; instead, the majority simply ignores it. The majority also fails to consider our conclusion in *Lucido* that concerns about judicial economy—which *Sims* cited in support of its conclusion (*Sims*, *supra*, 32 Cal.3d at p. 488)—"pale before the importance of preserving the criminal trial process as the exclusive forum for determining guilt or innocence as to new crimes." (*Lucido*, *supra*, 51 Cal.3d at p. 351.) Nor does the majority consider *Vandenberg*'s analysis and application of two relevant policy considerations: the judicial system's integrity and judicial economy. In purporting to follow *Sims* as a matter of stare decisis, the majority proceeds as if *Lucido* and *Vandenberg*, which are also entitled to respect as precedents of this court, have nothing to say about how to apply the relevant policy factors. Most notably, the majority makes no effort to resolve the tension between *Lucido*, which emphasized the public's interest in preserving the criminal trial process as the proper forum for determining criminal guilt or innocence, and *Sims*, which did not even mention this consideration.

The majority incorrectly disregards *Lucido* in another important respect. According to the majority, the People may avoid the collateral estoppel problem that exists under the majority's conclusion simply by pursuing a criminal case "as speedily as the County pursues the matter administratively." (Maj. opn., *ante*, at p. 1089.) In *Lucido*, we expressly rejected a similar analysis. There, after noting that "the People could avoid being collaterally estopped" by the decision in a probation revocation hearing "by prosecuting first" and "seeking revocation afterward," we stated: "As in our previous cases, . . . we refuse to mandate such a chronology. [Citation.]" (*Lucido*, *supra*, 51 Cal.3d at p. 348, fn. 10.) Thus, in essentially mandating that a criminal prosecution be finished before completion of an administrative fair hearing, the majority again disregards *Lucido*.

In any event, the majority's discussion of this consideration rests on a false premise: that a county is in control of the speed with which administrative proceedings progress. It is *the welfare recipient*, not the county, who initiates the fair hearing process by filing a request. (§§ 10950, 10951.) Moreover, the governing regulations *require* that the hearing be *decided* within 90 days of the date the request is filed (60 days if the claim involves only food stamps),

unless the recipient waives this requirement. (MPP, § 22-060.1.) Thus, the majority errs in suggesting that the speed of the administrative fair hearing process is within a county's control. The welfare recipient's control over the timing of the fair hearing process and the short regulatory time limit for deciding a fair hearing refute the majority's view that the People can easily avoid collateral estoppel's application in a criminal case simply by ensuring that prosecution is completed and a verdict rendered before an administrative fair hearing is concluded.

The majority disregards *Lucido* in at least one other important respect. The majority asserts that *Sims* merely made "observation[s]" about the restitution-first requirement that provided "nonessential[] support for our holding." (Maj. opn., *ante*, at p. 1081.) As I have explained, in *Lucido*, we took a decidedly different view of *Sims*'s discussion. (*Ante*, at p. 1097.) Supporting our analysis in *Lucido* is our statement in *Sims* that refusing to apply collateral estoppel there would have required us "to ignore" the legislatively established "safeguard[]" established by the restitution-first requirement. (*Sims, supra,* 32 Cal.3d at p. 489.) Indeed, despite its assertion, the majority elsewhere concedes that the restitution-first requirement was "*one* basis for our decision in *Sims*" and was "one factor" we considered there in applying the "multifactor analysis" that governs application of the collateral estoppel doctrine. (Maj. opn., *ante*, at p. 1083.) Thus, contrary to the majority's view, the issue here is not whether the restitution-first requirement was "the *only* ground[]" for our decision in *Sims*. (*Ibid.*) Rather, the issue is how to apply the governing multifactor test *absent* the restitution-first factor that was "*one* basis for our decision in *Sims*" (*ibid.*) and in light of our discussion and application of that test in *Lucido* and *Vandenberg*. Contrary to the majority's assertion, given *Lucido*, *Vandenberg*, and the relevant statutory changes, stare decisis poses no obstacle to reaching a conclusion here different from the one we reached in *Sims*. As the majority expressly recognizes, " 'reexamination of precedent may become necessary when subsequent developments indicate an earlier decision . . . has become ripe for reconsideration . . . .' " (Maj. opn., *ante*, at p. 1080, quoting *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 297 [250 Cal.Rptr. 116, 758 P.2d 58].)

The majority's attempts to distinguish *Lucido* are unsuccessful. According to the majority, the facts in *Lucido* "did not raise the concern expressed in *Sims*" that allowing criminal proceedings after an ALJ's findings of no fraud and no overpayment would "leave" welfare recipients "exposed to being 'harassed by repeated litigation.' [Citation.]" (Maj. opn., *ante*, at p. 1086.) However, although *Lucido* did not involve a welfare recipient, we *did* consider in that case the fact that applying collateral estoppel to a decision in

a probation revocation hearing "would eliminate repetitive litigation" and "prevent [the defendant] from being subjected to consecutive proceedings raising the same factual allegations." (*Lucido, supra,* 51 Cal.3d at p. 351.) As noted above, regarding this issue, we stated: "The essence of vexatiousness . . . is not mere repetition. Rather, it is harassment through baseless or unjustified litigation. [Citation.]" (*Ibid.*) Thus, whereas *Sims* found that it would have been "manifestly unfair" to permit the defendant's criminal prosecution after she "successfully demonstrated her innocence" at a "fair hearing" in which the government "had an adequate opportunity . . . to prove" its case (*Sims, supra,* 32 Cal.3d at p. 489), we held in *Lucido* that "mere repetition" is not enough to implicate the public policy concern about vexatious litigation. (*Lucido, supra,* at p. 351.) Given that *Sims* apparently equated repetition with harassment, and did not, in considering the integrity of the judicial system and judicial economy, even mention the importance of preserving the criminal trial process as the proper forum for determining criminal guilt or innocence, the majority is simply incorrect in asserting that the "bases for our decision in *Sims*" other than the restitution-first requirement "remain untouched by our decision in *Lucido.*"[5] (Maj. opn., *ante,* at p. 1085.)

Also unpersuasive is the majority's view that the facts in *Lucido* "did not raise the concern expressed in *Sims*" that allowing criminal proceedings after an ALJ's findings of no fraud and no overpayment would "impose a hardship on" welfare recipients. (Maj. opn., *ante,* at pp. 1085–1086.) As noted above, the "hardship" we identified in *Sims* was that involved in requiring a welfare recipient, after establishing at a fair hearing that benefits were "legally obtained," to "plan[] a budget for limited resources" based on the possibility "he or she may still be required to return the benefits . . . ." (*Sims, supra,* 32 Cal.3d at pp. 488–489.) In my view, forcing convicted criminals who have successfully avoided probation revocation by establishing that they did not commit a new offense to plan their lives based on the possibility they might still be convicted of and incarcerated for that offense presents an equal or greater hardship; nonetheless, that is what *Lucido* requires.

In any event, the facts of this case do not present the hardship at issue in *Sims.* Whereas the hearing officer in *Sims* found that the defendant had not received overpayments and was entitled to keep the money in question (*Sims, supra,* 32 Cal.3d at p. 474), the ALJ here ruled that defendant did receive overpayments and had to return the extra money. Thus, in declining to apply

---

[5] In view of this analysis, I disagree with the majority's view that our discussion in *Lucido* contains no "implication that we would have decided *Sims* differently had the former statutory scheme for resolution of welfare fraud been different." (Maj. opn., *ante,* at p. 1085.) The majority's observation that *Lucido* contains no express "statement" to this effect (*ibid.*) is both curious and unremarkable. It would have been entirely inappropriate to make such a statement, as that question was not before us in *Lucido.*

collateral estoppel and permitting defendant's prosecution to go forward, the trial court did not threaten defendant with having to return money the ALJ ruled she could keep. As noted above, in *Sims,* we identified the relevant inquiry as whether "policy" considerations supported collateral estoppel's application on "the facts of [that] case" (*id.* at p. 477), and we carefully limited our holding to "the particular and special circumstances of [that] case." (*Id.* at p. 489.) Given these statements and the factual differences between *Sims* and the case now before us, the majority errs in concluding that "[p]rinciples of stare decisis" prevent us from reaching a different conclusion here. (Maj. opn., *ante,* at p. 1080.)

The majority also errs in asserting that this case "differs from *Lucido*" in that " '[p]robation revocation hearings and criminal trials serve different public interests' " whereas "the purposes" of administrative fair hearings and welfare fraud prosecutions "do not differ greatly." (Maj. opn., *ante,* at p. 1087.) The majority incorrectly indicates that the purpose of the administrative fair hearing here was " 'to prove that [defendant] had *fraudulently* obtained welfare benefits.' " (*Ibid.,* italics added.) As the majority elsewhere explains, the issue at the fair hearing here was not whether defendant obtained the overpayments *fraudulently,* but whether they " 'were the result of administrative errors or [defendant's] failure to report [her children's] absence from her home.' " (*Id.* at p. 1075.) In answering this question, it was unnecessary for the ALJ also to determine whether defendant had a fraudulent intent. (See *People v. Camillo* (1988) 198 Cal.App.3d 981, 989, fn. 3 [244 Cal.Rptr. 286]; *People v. Faubus* (1975) 48 Cal.App.3d 1, 5–6 [121 Cal.Rptr. 167].) The governing statutes confirm that the DSS was not required to prove defendant acted with fraudulent intent in order to obtain reimbursement. (§ 11004.)

Indeed, under DSS regulations, the ALJ apparently lacked jurisdiction to determine whether defendant acted with fraudulent intent. The regulations provide that "intentionally" making "a false or misleading statement, or misrepresent[ing], conceal[ing], or withh[o]ld[ing] facts" constitutes an "Intentional Program Violation[]" (IPV). (MPP, §§ 20-300.1.11, 20-351i(1)(a).) IPV's may be dealt with administratively *only* at an "administrative disqualification hearing" (*id.,* §§ 63-801.1.11, 63-801.231), which may be initiated only *by the DSS or a county* through service of notice on the welfare recipient. (*Id.,* §§ 22-201.412, 22-202.51, 22-315.5.) The fair hearing at issue here, which was initiated *by defendant's request* in response to the notices of action (maj. opn., *ante,* at p. 1075), was not an administrative disqualification hearing. (See MPP, §§ 22-200.2 ["Administrative disqualification hearings are distinct from" fair hearings], 22-301.2 [same].) Indeed, because a criminal action was filed in this case, an administrative disqualification hearing to determine whether defendant committed an IPV could not have been held. (*Id.,* §§ 20-300.24, 20-352.3.) And, because an IPV had not been established

at an administrative disqualification hearing (or by a court), to the extent DSS claimed that defendant was at fault, the regulations *required* the claim to be "established and handled as an inadvertent household error claim." (*Id.*, § 63-801.23.231.) Thus, it was not within the ALJ's authority here to determine at defendant's fair hearing whether she acted with fraudulent intent.

In this regard, this case materially differs from *Sims*. There, the DSS alleged that the defendant had "fraudulently obtained" benefits by failing to report material information. (*Sims, supra*, 32 Cal.3d at p. 473.) Under the statutory scheme that governed the defendant's fair hearing in *Sims*, whether the overpayments resulted from a "willful failure to report facts" or "any willfully fraudulent device," and whether the defendant had "willfully withheld information" were expressly relevant to the DSS's ability to recoup overpayments. (Former § 11004, subds. (d) & (e), added by Stats. 1979, ch. 804, § 2, pp. 2767, 2768, and repealed by Stats. 1982, 1st Ex. Sess., ch. 3, § 2, p. 6890.) The defendant denied that she had failed to disclose material information and she denied that she had received benefits to which she was not entitled. Thus, the ALJ in *Sims* had to determine whether the defendant had acted fraudulently, and it expressly found that the DSS failed to prove she "fraudulently obtained welfare benefits." (*Sims, supra*, 32 Cal.3d at p. 474.) It therefore ruled that the defendant was entitled to keep all benefits she had received and ordered the DSS to "refund any restitution payments [she] had made." (*Ibid.*) Here, as already explained, the function of the fair hearing was to determine whose conduct caused the overpayments defendant received, and under the governing statute, whether defendant acted fraudulently was irrelevant to determining that question.

The purposes of administrative fair hearings and criminal prosecutions for welfare fraud appear to differ in another important respect: the nature of the causation inquiry. In the trial court, defendant's counsel asserted that the ALJ here had only "two choices" regarding causation: "either county error or client" conduct. These two choices excluded the possibility of finding that both county error and defendant's conduct were contributing factors. Counsel's argument is fully consistent with the ALJ's statement of the issue before him: "Whether the overissuance and overpayment were the result of administrative errors or [defendant's] failure to report [her children's] absence from her home." It is also consistent with the governing administrative regulations, which required the ALJ at the fair hearing to find that the overpayments were caused either by administrative error or by inadvertent household error. (MPP, §§ 63-801.211, 63-801.221.) Thus, the purpose of the fair hearing was to

determine which of two mutually exclusive possible causes was *the* cause of the overpayments. For this reason, as the majority explains, the ALJ's decision that the overpayments were caused by administrative errors "leaves open the possibility that defendant made misstatements that were a contributing cause to the overpayments." (Maj. opn., *ante*, at p. 1090.) As the majority also explains, the causation inquiry in defendant's criminal prosecution for welfare fraud was different; it did not focus on determining *the exclusive cause* of the overpayments. In this regard, the purposes of administrative fair hearings and criminal prosecutions for welfare fraud are surely different.

In other respects, administrative fair hearings and criminal welfare fraud prosecutions "serve different public interests" in the same sense that, as we found in *Lucido*, "[p]robation revocation hearings and criminal trials serve different public interests . . . ." (*Lucido, supra*, 51 Cal.3d at p. 347.) A criminal prosecution is *initiated by the People* to vindicate the public's "vital interest in enforcement of [its] criminal laws." (*United States v. Jorn* (1971) 400 U.S. 470, 479 [27 L.Ed.2d 543, 91 S.Ct. 547].) That interest includes "deter[ring] the individual from committing acts that injure society" and "express[ing] society's condemnation of such acts *by punishing them*." (*People v. Roberts* (1992) 2 Cal.4th 271, 316 [6 Cal.Rptr.2d 276, 826 P.2d 274], italics added; see also *Best v. State Bar* (1962) 57 Cal.2d 633, 637 [21 Cal.Rptr. 589, 371 P.2d 325] ["purpose" of a "criminal proceeding" is "punishment" if "accused . . . is found guilty"].) As previously noted, an administrative fair hearing is *initiated by a welfare recipient* to vindicate the recipient's own *private* interest in challenging an "action of the county [welfare] department relating to his or her application for or receipt of public social services . . . ." (§ 10950.) It provides a " 'welfare recipient with a speedy [citation] and informal [citation] means to challenge an administrative action [that] may reduce or terminate' " benefits. (*Lentz v. McMahon* (1989) 49 Cal.3d 393, 402 [261 Cal.Rptr. 310, 777 P.2d 83].) No punishment results from an administrative fair hearing. Thus, like the probation revocation hearing at issue in *Lucido*, an administrative fair hearing, "despite its obvious importance to" a welfare recipient, "neither threatens" the recipient "with the stigma of a new conviction nor with punishment . . . ." (*Lucido, supra*, 51 Cal.3d at p. 348.) Moreover, like "the hearing judge in a revocation proceeding," an ALJ's "fundamental role and responsibility" at an administrative fair hearing "is not to determine whether" the subject of the hearing "is guilty or innocent of a crime" (*ibid.*); the ALJ's responsibility is to determine whether the DSS has properly found that the welfare recipient must reimburse the agency for benefits that should not have been paid. To paraphrase *Lucido*, "[b]ecause the limited nature of this inquiry may not involve or invoke

presentation of all evidence bearing on the underlying factual allegations, the [DSS's] failure to satisfy the lower burden of proof at the [administrative fair] hearing does not necessarily amount to an acquittal or demonstrate an inability to meet the higher criminal standard of proof. [Citation.]" (*Ibid.*) For these reasons, the majority errs in asserting that "the purposes" of administrative fair hearings and welfare fraud prosecutions "do not differ greatly." (Maj. opn., *ante*, at p. 1087.) Accordingly, as we concluded in *Lucido* with respect to a probation revocation hearing, I conclude that "[p]reemption of trial of a [criminal] charge by [a fair hearing] decision designed to perform a wholly independent social and legal task would undermine the function of the criminal trial process as the intended forum for ultimate determinations as to guilt or innocence of newly alleged crimes." (*Lucido*, *supra*, 51 Cal.3d at p. 349; cf. *People v. Barragan* (2004) 32 Cal.4th 236, 256 [9 Cal.Rptr.3d 76, 83 P.3d 480] [declining to apply collateral estoppel because of the public's "substantial interest in . . . 'prevent[ing]' [criminal] offenders 'from escaping the penalties imposed by [recidivism] statutes through technical defects in . . . proof' "].)

The majority also errs in asserting that *Lucido* can meaningfully be distinguished by the absence in this case of "evidentiary rules [that] prohibit a welfare recipient's testimony at an administrative hearing from being introduced at a later criminal trial for welfare fraud." (Maj. opn., *ante*, at p. 1086.) In *Lucido*, we explained that such rules "guarantee[] the probationer the ability to present a full case at the [revocation] hearing without running the risk of prejudicing his defense at a subsequent [criminal] trial." (*Lucido*, *supra*, 51 Cal.3d at p. 351.) In the context of administrative welfare fraud hearings, such evidentiary rules are not critical to a welfare recipient's ability fully to present his or her case. By statute, administrative fair hearings are "informal," must be conducted "in order to encourage free and open discussion by the participants," and are not constrained by the "rules of procedure or evidence applicable in judicial proceedings." (§ 10955.) DSS regulations provide that "evidence shall be admitted [at an administrative fair hearing] if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs." (MPP, § 22-050.2.) Thus, welfare recipients can fully present their cases at administrative fair hearings through means other than their own sworn testimony. Moreover, a welfare recipient who wants to testify but who is concerned that his or her testimony may be used at a subsequent criminal trial can readily solve this potential dilemma by requesting that the fair hearing be continued until completion of the criminal prosecution. (See *id.*, §§ 22-053 [postponements and continuances], 22-060.1 [allowing claimant to waive requirement that fair hearing be decided within 60 or 90 days of date hearing request is filed].)

In any event, the majority's focus on this issue is a red herring because the dilemma exists even under the majority's view that collateral estoppel may, as a matter of public policy, apply in this context. Welfare recipients who lose at administrative fair hearings cannot assert collateral estoppel and thus may have their hearing testimony used at any subsequent criminal trial. Of course, at the time they must decide whether to testify at the administrative hearing, welfare recipients cannot know whether they will win or lose. Thus, at the time the decision whether to testify must be made, even under the majority's view that collateral estoppel applies *if* they win, welfare recipients face the risk they will lose and that their testimony will therefore be admissible against them at a subsequent criminal trial. Therefore, in this context, even under the majority's view, welfare recipients trying to decide whether to testify at administrative hearings must still consider the possibility that their testimony may later be used against them in criminal proceedings. Because the concern the majority discusses exists whether or not collateral estoppel potentially applies, the majority errs in relying on this consideration as a basis for reaching a policy conclusion here different from the one we reached in *Lucido*.[6]

Indeed, contrary to the majority's analysis, under *Vandenberg*, the most meaningful distinction between this case and *Lucido* establishes that it would be even *more* appropriate—not less—to apply collateral estoppel's public policy exception in this case than it was in *Lucido*. The probation revocation hearing in *Lucido* was a *judicial* proceeding decided by a judge of a "justice court." (*Lucido, supra,* 51 Cal.3d at p. 339.) The fair hearing in this case was an *administrative* proceeding decided by a nonjudicial officer. As previously explained, under *Vandenberg*, that administrative fair hearings are "*outside* the judicial system" and do "not involve the use of a judge and a courtroom" *supports* the conclusion that, as a matter of public policy, we should not apply collateral estoppel in this case. (*Vandenberg, supra,* 21 Cal.4th at p. 833.)

The majority's stated reason for disregarding *Vandenberg* is inadequate. According to the majority, *Vandenberg* involved "a private arbitration" that "effectively 'bypass[ed] the judicial system,' " whereas this case involves "a matter of public concern" dealt with in " 'a judicial-like adversary proceeding' [citation] that [was] conducted by a state entity, the DSS, whose administrative law judges must follow California law and render decisions subject to judicial review. [Citation.]" (Maj. opn., *ante,* at p. 1086, fn. 6.) In

---

[6] Because defendant did not testify at her administrative fair hearing, any concern about unfairness in actually using a welfare recipient's fair hearing testimony at a subsequent criminal trial is irrelevant to determining whether policy considerations support applying collateral estoppel "[i]n the particular and special circumstances of this case." (*Sims, supra,* 32 Cal.3d at p. 489.)

making this assertion, the majority once again ignores prior precedent of this court, which characterizes "private arbitration proceedings" as " 'quasi-judicial' proceedings . . . that are functionally equivalent to court proceedings. [Citation.]" (*Moore v. Conliffe* (1994) 7 Cal.4th 634, 645 [29 Cal.Rptr.2d 152, 871 P.2d 204].) The majority also ignores the fact that in *Vandenberg*, the arbitration "took place before a retired federal judge," the parties conducted "[f]ormal discovery," "the transcribed proceedings included representation by counsel, and extensive evidence, briefing, and argument," the arbitrator issued "a lengthy and detailed decision," and the arbitration award was *judicially* "confirmed by a superior court judgment" (*Vandenberg, supra*, 21 Cal.4th at p. 826), which gave it "the same force and effect as . . . a judgment in a civil action of the same jurisdictional classification" and made it enforceable "like any other judgment of the court in which it [was] entered . . . ." (Code Civ. Proc., § 1287.4.) By contrast, in this case, the administrative proceeding never involved a court in any capacity. Because the ALJ's decision here was entirely "*outside* the judicial system" and the fair hearing did "not involve the use of a judge and a courtroom" (*Vandenberg, supra*, 21 Cal.4th at p. 833), *Vandenberg*'s discussion of these considerations in connection with arbitration fully applies, whether or not, as the majority asserts, the fair hearing was " 'judicial-like' " and involved "a matter of public concern."[7] (Maj. opn., *ante*, at p. 1086, fn. 6.)

Finally, for several reasons, the majority's assertion that the Legislature, in amending the welfare fraud statutes in 1984, "did not contemplate abrogating *Sims*" (maj. opn., *ante*, at p. 1087) is unpersuasive. First, it is largely beside the point. As we have explained, the result in *Sims* was a *judicial* policy decision that was "informed by the 'unique statutory scheme' at issue there. [Citations.]" (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 851 [25 Cal.Rptr.2d 500, 863 P.2d 745].) Thus, the primary question here is not whether the Legislature intended to abrogate *Sims*, but whether we should make a different policy decision in this case because, among other things, the " 'unique statutory scheme' " that "informed" our policy decision in *Sims* (*ibid.*) has been materially changed.

Second, the majority's analysis is inconsistent with our prior decisions. The majority asserts that we must presume the Legislature was aware of *Sims* and would have specified that administrative decisions do not preclude criminal prosecutions for welfare fraud had it wanted to invalidate *Sims*. (Maj. opn., *ante*, at p. 1088.) We rejected a very similar argument in *Estate of Kachigian* (1942) 20 Cal.2d 787 [128 P.2d 865]. At issue there was our construction of

---

[7] Of course, the analysis might be different had defendant petitioned under section 10962 for *judicial* review of the ALJ's decision and were we dealing with a *superior court judgment* rendered after that review.

the probate homestead statutes, which we had based on the homestead statutes that apply before death. (*Id.* at pp. 788–790.) The question we faced was whether a legislative amendment to the latter affected the former. (*Ibid.*) Offering an analysis very similar to the majority's, the respondent in *Kachigian*, who contended that the amendment did not effect a change, argued: "[I]t must be presumed that the Legislature was familiar with the former decisions and that in failing to change the probate statutes it must have intended to leave the probate law unchanged." (*Id.* at p. 790.) We rejected the argument, stating: "[I]f we presume that the Legislature was familiar with the former decisions, it would seem improper for us to presume that it was unaware of their basic reasoning and hold that it did not realize the probate rule must change if the basis therefor were changed." (*Ibid.*) Similarly, here, "if we presume that the Legislature was familiar with [*Sims*], it would seem improper for us to presume that [the Legislature] was unaware of [*Sims's*] basic reasoning and hold that [the Legislature] did not realize the [*Sims*] rule must change if [a] basis therefor were changed." (*Ibid.*) Thus, I disagree with the majority's view that the Legislature, in repealing the statutory requirement that informed our decision in *Sims*, "did not contemplate abrogating *Sims*."[8] (Maj. opn., *ante*, at p. 1087.)

As the preceding analysis demonstrates, ultimately, in concluding that *Sims* does not "warrant reconsideration" (maj. opn., *ante*, at p. 1074), the majority is focusing on the wrong question. As noted above, in *Sims*, we considered whether "policy" considerations supported collateral estoppel's application on "the facts of [that] case" (*Sims, supra,* 32 Cal.3d at p. 477), and we expressly limited our holding to "the particular and special circumstances of [that] case." (*Id.* at p. 489.) As also explained above, the facts and circumstances of the case now before us are different: the restitution-first requirement that was a "basis for our decision in *Sims*" (maj. opn., *ante*, at p. 1083) no longer exists, the ALJ ruled that defendant must repay the overpayments she received, and the question of whether defendant *intentionally* made misrepresentations or omissions was not at issue in the administrative proceeding. Thus, the question we must answer here is not, as the majority posits, whether to reconsider *Sims*, but is whether to *extend* that decision to the

---

[8] The majority correctly observes at the end of a long footnote that "unpassed bills 'have little value' in ascertaining legislative intent. [Citation.]" (Maj. opn., *ante*, at p. 1088, fn. 7.) Indeed, as we have explained, "because the Legislature's failure to enact a proposed statutory amendment may indicate many things other than approval of a statute's judicial construction, including the pressure of other business, political considerations, or a tendency to trust the courts to correct its own errors," " '[w]e can rarely determine from the failure of the Legislature to pass a particular bill what the intent of the Legislature is with respect to existing law.' [Citation, fns. omitted.]" (*People v. Mendoza* (2000) 23 Cal.4th 896, 921 [98 Cal.Rptr.2d 431, 4 P.3d 265].) In light of these well-established principles, it is unclear why the majority, in its textual discussion, appears to emphasize the Legislature's failure to pass a bill that would have expressly abrogated *Sims*. (Maj. opn., *ante*, at p. 1088.)

different facts and circumstances of this case. More precisely, under *Lucido*, a precedent of this court that the majority simply ignores in relevant part, the question we must answer is whether "compelling public policy considerations outweigh[] the need for determinations of guilt and innocence to be made in the usual criminal trial setting." (*Lucido*, *supra*, 51 Cal.3d at p. 349.) Because I find no such consideration and the majority fails to identify one, and because the majority offers no meaningful basis for distinguishing *Lucido* and concluding that although collateral estoppel does not apply after probation revocation hearings, it may apply after administrative fair hearings, were it necessary to decide the question here, I would hold that public policy considerations do not support applying collateral estoppel in "the particular and special circumstances of this case." (*Sims*, *supra*, 32 Cal.3d at p. 489.)

Corrigan, J., concurred.