Filed 6/8/16  Yhip v. Superior Court CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| JAMES PETER YHIP et al., | C075617 |
| Petitioners, | (Super. Ct. Nos. CM036919 & CM036920) |
| v. | |
| THE SUPERIOR COURT OF BUTTE COUNTY, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

THE COURT:

It is ordered that the opinion filed herein on May 16, 2016, be modified as follows:

1

On page 1, the first sentence ending in "the Yhip's two other children" is corrected to read "the Yhips' two other children."

On page 7, line 6, the word "that" after "it had heard evidence that" is deleted so the sentence reads:

> As is relevant here, it stated that it had "considered" the fact that no one testified that either parent had caused Benjamin's death, that it had heard evidence that the parents were concerned and loving to all three children, that it "considered" the evidence that Benjamin died due to illness rather than criminal agency, and that it "considered" evidence that the parents sought appropriate medical treatment for Benjamin and that he did not die due to neglect in seeking medical treatment.

On page 7, in the last sentence of the first full paragraph, the word "it" is changed to "in," so the sentence reads:

> Instead, the juvenile court may have reasoned that given the conflicting evidence, it could return the children to their parents based upon a finding that those children were not in danger without the necessity of determining whether the parents had abused Benjamin.

On page 9, in the second sentence of the first paragraph, the word "parole" is changed to "probation" so the sentence reads:

> Included in this determination was the concern that a probation revocation hearing is an inquiry of limited nature that might not involve the presentation of all evidence bearing on the facts.

On page 14, in the third sentence of the second paragraph the word "procedures" is corrected to be "proceedings."  As corrected this sentence reads:

> Here, those differing purposes likely result in the dependency proceeding being tried with different evidence than the criminal proceeding because of the differing timelines of the proceedings.

There is no change in the judgment.

Petitioners' petition for rehearing is denied.

BY THE COURT:

  _/s/_____
Blease, Acting P. J.

  _/s/_____
Hull, J.

  _/s/_____
Murray, J.

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| JAMES PETER YHIP et al., | C075617 |
| Petitioners, | (Super. Ct. Nos. CM036919 & CM036920) |
| v. | |
| THE SUPERIOR COURT OF BUTTE COUNTY, | OPINION ON REMAND |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

Edelyn and James Peter Yhip, who were accused of the murder and child abuse of their son Benjamin, brought a motion to dismiss the charges against them on the theory the prosecution was collaterally estopped from pursuing the criminal case because of the disposition in their favor of a related juvenile dependency proceeding involving the Yhip's two other children.  The trial court denied the motion, and the Yhips filed a writ of mandate with this court, which we denied.

They petitioned the Supreme Court for review. The Supreme Court granted the petition for review and transferred the matter back to this court with directions to vacate the order denying the mandate, and to issue an order directing the trial court to show cause why the relief sought should not be granted.

Having reviewed the matter, we conclude that collateral estoppel is not applicable in this case because the issue to be resolved in the criminal case was not decided in the juvenile dependency proceeding, and because policy concerns weigh against an application of collateral estoppel under the facts presented here. We shall deny the writ.

FACTUAL AND PROCEDURAL BACKGROUND

James Yhip and his wife Edelyn adopted twin brothers Benjamin and J. from Taiwan.[1] The Yhips also had an older daughter, M. Benjamin suffered from a kidney condition while he was in Taiwan, from which he fully recovered. He was diagnosed with reactive attachment disorder after he came to live with the Yhips. James reported to investigators that Benjamin banged his head when he was upset. James also reported that Benjamin vomited frequently, and that the vomiting was self-induced. James reported that Benjamin had been hospitalized for severe malnutrition and renal failure in November 2011 because he refused to eat. At the time of his death, Benjamin had a feeding tube that fed him directly into his stomach. Benjamin cried excessively, according to James, and had done so since they picked him up in Taiwan. Benjamin's health problems were so exhausting for Edelyn, that the Yhips had decided to have Benjamin re-adopted (adopted by another family).

On April 18, 2012, Edelyn called 911. The emergency medical technicians found Benjamin lying on the floor, pale, not breathing, and unresponsive. Benjamin was taken to a hospital in Chico. The doctors there found no sign of any brain function. Benjamin

---

[1] We refer to Benjamin's parents by their first names solely to avoid confusion. No disrespect is intended.

2

was transferred to a hospital in Sacramento, where he died the next day. The autopsy report indicated Benjamin died of anoxic encephalopathy due to blunt force trauma and craniocerebral injuries. He also showed signs of malnutrition and hypothermia. Benjamin was two years eight months old.

Butte County Children's Services detained M. and J. Butte County filed a juvenile dependency petition pursuant to Welfare and Institutions Code section 300, subdivision (j).[2] Section 300, subdivision (j) provides that the juvenile court may adjudge a child a dependent if: " [t]he child's sibling has been abused or neglected, . . . and there is a substantial risk that the child will be abused or neglected . . . . The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

After a lengthy jurisdictional trial, the juvenile court ruled as follows:

"In the case of In re: Ricardo L., 109 Cal.App.4th 552, it was made clear that there are two prongs to a [section] 300 [subdivision] (j) allegation, each of which must be proved by the Department.

"As to the second prong, the Department has not presented evidence that preponderates towards a finding that [J.] or [M.] are at substantial risk to be abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i) of the W[elfare] and I[nstitutions] Code Section 300.

"I have considered [J.'s] age and gender in relation to Benjamin's. I have considered the circumstances surrounding the alleged abuse of Benjamin, the argument that a parent lost patience with a very sick child who was rejecting the parent. I have considered the nature of the alleged abuse, the infliction of force sufficient to cause a head injury. I have considered the alleged depression of the mother. I have also considered

_____

[2]  Further statutory references to sections of an undesignated code are to the Welfare and Institutions Code.

3

that there is no person who has come forward to state that either parent inflicted the force alleged to have caused Benjamin's death.

"To the contrary, I have heard the abundant evidence that each parent has nothing other -- was nothing other than a concerned, loving, and appropriate parent to all three children.

"I've also considered there's a large body of evidence which suggests that Benjamin died due to extreme illness as opposed to criminal agency. I have also considered that the parents at all times sought appropriate medical treatment for Benjamin and, hence, Benjamin did not die due to neglect of the parents in seeking medical treatment.

". . . [T]he Court has had an opportunity to observe the parents and to rule on numerous motions to expand visitation of [J.] and [M.] to the point where the Court returned the children over a month ago.

"The county has failed to prove the second prong of the [subdivision] (j) allegation of Section 300.

"Accordingly, under Section 356, the petition is dismissed and the children are dismissed from any restriction previously ordered."

Prior to the conclusion of the juvenile matter, the People filed an information charging Edelyn and James with murder and child abuse. After the conclusion of the juvenile matter, the Yhips made a motion to dismiss the criminal proceeding on the ground of collateral estoppel. The trial court denied the motion on the ground the estopped parties were not in privity, opining that "[i]f the District Attorney had to anticipate that every ruling coming from another court could have the effect of collateral estoppel, it would necessitate staffing all other proceedings with representatives from the District Attorney's office to ensure all the issues were litigated to his satisfaction."

The Yhips filed a petition for writ of mandate with this court, which was denied. The Yhips then petitioned for review with the Supreme Court, and the court granted the petition. The Supreme Court directed this court to vacate the order denying mandate and issue an order directing the superior court to show cause why the relief sought should not be granted. We issued the order to show cause.

4

DISCUSSION

As indicated, Edelyn and James argue the criminal case must be dismissed because the doctrine of collateral estoppel bars the relitigation of issues that were decided in the juvenile proceeding. Collateral estoppel bars the relitigation of an issue decided in a prior proceeding, " '(1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding].' [Citation.]" (*People v. Sims* (1982) 32 Cal.3d 468, 484, fn. omitted, superseded by statute on another ground as stated in *Gikas v. Zolin* (1993) 6 Cal.4th 841, 851-852.)

The trial court found that the issue decided by the juvenile court was identical to the issue to be decided in the criminal case, thus the first element of collateral estoppel was met. The court also found no dispute that the dependency ruling was a final judgment on the merits. However, the trial court found that Butte County Children's Services and the district attorney for Butte County were not in sufficient privity to compel dismissal of the criminal case.

The trial court recognized that *People v. Percifull* (1992) 9 Cal.App.4th 1457 (*Percifull*), did not apply collateral estoppel because of the " 'importance of preserving the criminal trial process as the exclusive forum for determining guilt or innocence as to new crimes,' " and because the two proceedings serve different public interests and purposes, since juvenile proceedings are intended to protect the public, the minor, and the minor's family ties if possible.

The trial court also recognized contrary authority in *Lockwood v. Superior Court* (1984) 160 Cal.App.3d 667 (*Lockwood*). In *Lockwood*, the court dismissed a felony child abuse prosecution after a dependency petition based on the same facts was dismissed as a result of conflicting expert testimony as to the cause of the child's injuries. The trial court stated that *Lockwood* found the issues were identical even though the purposes of

5

the two proceedings were different. The parties' briefing focuses on this split of authority, and the policies behind applying collateral estoppel in a criminal case following the conclusion of a juvenile dependency proceeding. We review the trial court's decision whether to apply collateral estoppel de novo. (*Roos v. Red* (2005) 130 Cal.App.4th 870, 878.)

I

The Issue to be Decided in the Criminal Case
Was Not Necessarily Decided in the Juvenile Case

Collateral estoppel will not bar relitigation of an issue unless the issue decided at the previous proceeding is identical to the one sought to be relitigated. (*People v. Sims*, *supra*, 32 Cal.3d at p. 484.)[3] James and Edelyn are charged in the criminal information with murder and child abuse. The issues to be decided relative to the charge of murder were whether one or both parents unlawfully killed Benjamin with malice aforethought. (Pen. Code, § 187.) The issues to be decided relative to the charge of child abuse were whether one or both parents willfully inflicted or permitted unjustifiable injury on Benjamin under circumstances likely to produce great bodily harm or death. (Pen. Code, § 273a, subd. (a).)

In the dependency proceeding, the court could not declare M. and J. dependent and within the jurisdiction of the juvenile court unless it found *both*: (1) that James and/or Edelyn had abused or neglected Benjamin, and (2) that there was a substantial risk that M. and J. would be abused or neglected. (§ 300, subd. (j).)

While the first issue may have been identical to the issue to be determined in the criminal case, the juvenile court specifically did not make a finding on that issue, but

---

[3] As indicated, collateral estoppel also requires that the previous proceeding resulted in a final judgment on the merits, and that the party against whom estoppel is asserted was a party or in privity with a party at the prior proceeding.

6

rested its judgment solely on the second issue. The juvenile court began and ended its ruling by finding that the county had not met its burden as to the second prong of section 300, subdivision (j). The court then went on to list a number of factors it considered and evidence it heard in the course of making its finding. As is relevant here, it stated that it had "considered" the fact that no one testified that either parent had caused Benjamin's death, that it had heard evidence that that the parents were concerned and loving to all three children, that it "considered" the evidence that Benjamin died due to illness rather than criminal agency, and that it "considered" evidence that the parents sought appropriate medical treatment for Benjamin and that he did not die due to neglect in seeking medical treatment. In listing these considerations, the court was following the directive of subdivision (j) of section 300, which states that the court may consider other facts it "considers probative in determining whether there is a substantial risk to the child."

Importantly, the juvenile court did not state that it had made a finding or determination that the parents had not abused Benjamin or caused his death, only that the court had considered evidence to that effect presented by the parents. We cannot say that the juvenile court necessarily determined that M. and J. were not in danger because the juvenile court found the parents had not abused Benjamin. Had that been the juvenile court's conclusion, it presumably would have said just that. Instead, the juvenile court may have reasoned that given the conflicting evidence, it could return the children to their parents based upon a finding that those children were not it danger without the necessity of determining whether the parents had abused Benjamin.

On this particular point, it is important to note that evidence was presented that Benjamin was treated differently than the other two children. For example, Benjamin and J. both used high chairs. J.'s chair had padding and a cover with print on it. Benjamin's had no padding, and was just white plastic. Benjamin's bedroom was at the opposite end of the house from the other bedrooms, with no photos on the wall. It

7

appeared to be a guest room with a crib in it. By contrast, M.'s room had pink walls and a pink bed, and contained toys, stuffed animals, books, and pictures of M. J.'s room was blue, and contained toys and clothes consistent with a little boy's room. Thus, the issue to be decided in the criminal action, i.e., whether one or both parents killed or abused Benjamin, was not an issue necessarily decided in the juvenile proceeding, since the juvenile court could have concluded M. and J. were in no danger from their parents because they were treated better than Benjamin.

II

Policy Concerns Rule Out Collateral Estoppel Here

Even if we were to conclude that all of the threshold requirements were satisfied, collateral estoppel is not appropriate unless its application will further the public policies of "preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 343 (*Lucido*).) We conclude this would not be an appropriate case for collateral estoppel even if all the threshold requirements were met, because application of the doctrine would not serve the fundamental principles underlying it.

A. *Lucido v. Superior Court*

In *Lucido, supra*, 51 Cal.3d 335, the Supreme Court held that a determination following a probation revocation hearing had no preclusive effect on a subsequent criminal trial based on the same charges. The court refused to apply collateral estoppel, even though the threshold requirements of collateral estoppel were met. The court stated that, "the public policies underlying collateral estoppel -- preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation -- strongly influence whether its application in a particular circumstance would be fair to the parties and constitutes sound judicial policy." (*Id.* at p. 343.)

8

*Lucido* held that the application of collateral estoppel would undermine the integrity of the judicial system because probation revocation hearings serve different public interests from criminal trials, and different concerns shape the People's pursuit of revocation on the one hand and conviction on the other. (*Lucido, supra*, 51 Cal.3d at p. 347.) Included in this determination was the concern that a parole revocation hearing is an inquiry of limited nature that might not involve the presentation of all evidence bearing on the facts. (*Id.* at p. 348.) *Lucido* stated that collateral estoppel should not be applied to preclude a criminal trial unless "compelling public policy considerations outweigh[] the need for determinations of guilt and innocence to be made in the usual criminal trial setting." (*Id.* at p. 349.)

*Lucido* further concluded that the factors involved in its determination that collateral estoppel would undermine the integrity of the judicial system outweighed the second of the public policies underlying collateral estoppel--the judicial economy that collateral estoppel would achieve. (*Lucido, supra*, 51 Cal.3d at pp. 350-351.) "Whatever the efficiencies of applying collateral estoppel in this case, they pale before the importance of preserving the criminal trial process as the exclusive forum for determining guilt or innocence as to new crimes." (*Id.* at p. 351.)

Finally, as to the third of the public policies underlying collateral estoppel, *Lucido* determined that collateral estoppel might eliminate repetitive litigation in the case before it, but that repetitive litigation is not vexatious litigation because it is not "harassment through baseless or unjustified litigation." (*Lucido, supra*, 51 Cal.3d at p. 351.) "The public has a legitimate expectation that a person once found guilty of a crime may both be held to the terms of his probation and (if deemed appropriate by the prosecution) tried anew for any offenses alleged to have been committed during the probationary period. For this reason, it is neither vexatious nor unfair for a probationer to be subjected to both a revocation hearing and a criminal trial. The People's failure to prevail at the revocation

9

hearing does not alone transform the otherwise permissible subsequent trial into harassment."  (*Ibid.*)

      B.  *Lockwood v. Superior Court* and *People v. Garcia*

      *Lockwood, supra,* 160 Cal.App.3d 667, is the case relied upon by Edelyn and James.  It is a First District Court of Appeal Case decided six years prior to *Lucido*. *Lockwood* held that a felony child abuse case accusing parents of inflicting abuse on their son, had to be dismissed on the ground of collateral estoppel after a juvenile court dismissed a dependency petition based on the same facts.  (*Id*. at p. 669.)  *Lockwood* focused on the fact that the threshold requirements for collateral estoppel had been met, but did not consider whether it might refuse to apply the doctrine for policy reasons, as was later determined by the Supreme Court in *Lucido*.

      Edelyn and James claim the Supreme Court "has recently commented that *Lockwood* may be rightly decided" in *In re Ethan C*. (2012) 54 Cal.4th 610.  Petitioners make entirely too much of *In re Ethan C.'s* reference to *Lockwood*.  *In re Ethan C*. held that juvenile court dependency jurisdiction based on causing the death of another child under section 300, subdivision (f) does not require criminal negligence, but only ordinary negligence.  (*In re Ethan C.,* at pp. 617-618, 637.)  Ethan C.'s father argued that when section 300, subdivision (f) was amended to eliminate the need for a criminal conviction as a prerequisite to dependency proceedings based on another child's death, a concern about collateral estoppel issues was raised.  (*In re Ethan C*., at p. 635.)  In response to the parent's argument that this would mean ordinary negligence could produce collateral estoppel problems in a criminal prosecution, the court stated even under an interpretation that required criminal negligence, the amendments reduced the standard of proof in a dependency case "and thus created a *potential* bar to criminal prosecution if an antecedent dependency proceeding resulted in a finding that criminal negligence had not been established by even a preponderance of evidence. (See *In re Nathaniel P*. (1989) 211 Cal.App.3d 660, 670; *Lockwood v. Superior Court* (1984) 160 Cal.App.3d 667, 672;

10

but see *People v. Percifull* (1992) 9 Cal.App.4th 1457, 1459; cf., *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 347.)"  (*In re Ethan C.*, at p. 635, italics added.)

This reference to *Lockwood* in dicta in no way overruled *Lucido*, or decided that collateral estoppel must be applied by courts whenever the threshold requirements are met, regardless of any public policy concerns.

Edelyn and James also claim that the Supreme Court's decision in *People v. Garcia* (2006) 39 Cal.4th 1070 (*Garcia*) limited the holding in *Lucido* "to its unique circumstances."  It did not.

*Garcia, supra*, 39 Cal.4th 1070, involved a prior administrative hearing which exonerated a welfare recipient (Garcia) of fraud charges.  The Supreme Court held that the exoneration by the Department of Social Services collaterally estopped a criminal prosecution for welfare fraud.  (*Id*. at p. 1074.)  However, *Garcia* is distinguishable from this case because of the court's concern over the doctrine of stare decisis.  In the earlier case, *People v. Sims* (1982) 39 Cal.4th 1070, the Supreme Court was confronted with the same issues it would later face in *Garcia*.  *People v. Sims* held that collateral estoppel prevented the People from prosecuting a defendant for welfare fraud after an administrative hearing exonerated the defendant of welfare fraud.  *Garcia* stated that, "[p]rinciples of stare decisis present a formidable obstacle to the People's request that we reconsider our decision in *Sims,* which has been the law for nearly 25 years . . . ." (*Garcia, supra,* 39 Cal.4th at p. 1080.)

In addition to the consideration of stare decisis, *Garcia* concluded that public policy considerations favored the application of collateral estoppel.  The court expressed particular concern that inconsistent judgments could undermine the integrity of the judicial system, since one proceeding could find the recipient had lawfully received benefits, and the other could find the same receipt of benefits constituted fraud.  (*Garcia*, *supra*, 39 Cal.4th at p. 1079.)  The court noted that the recipient could not rely on success in one forum, because he or she might still be required to return the benefits after a

criminal prosecution.  (*Ibid*.)  Thus, *Garcia* apparently concluded there was a lack of distinction between the purposes served by the administrative hearing to determine whether overpayments were the result of intentional violations, and the criminal prosecution for welfare fraud.  Rather than supporting the holding in *Lockwood*, which considered only whether the threshold elements of collateral estoppel were met, *Garcia* affirmed the Supreme Court's position in *Lucido*, which was that policy concerns must be part of the collateral estoppel equation, even though the threshold elements are present. In the welfare fraud context, the purpose of both the administrative and criminal proceedings is to stop welfare fraud.  As discussed below, the purposes of juvenile dependency and criminal prosecutions are very different.

    C.  *People v. Percifull*

    In *Percifull, supra*, 9 Cal.App.4th 1457, the Sixth District Court of Appeal confronted the question in the same context presented here, i.e., a criminal case following a juvenile dependency proceeding.  Recognizing that the case before it was procedurally similar to *Lockwood*, *Percifull* held that in light of *Lucido*, collateral estoppel should not be applied because of *Lucido's* "repeated emphasis on . . . 'the importance of preserving the criminal trial process as the exclusive forum for determining guilt or innocence as to new crimes.'  [Citation.]"  (*Percifull,* at pp. 1461.)

    Relevant to the discussion here, *Percifull* held that the dependency proceeding and the criminal prosecution were intended to serve different purposes, which were in some respects in direct conflict.  (*Percifull, supra*, 9 Cal.App.4th at p. 1462.)  "The dependency proceeding was intended to meet two vitally important social needs: protection of the child and preservation, so far as possible, of the integrity of the family."  *Id.* at p. 1461.) The purpose of the criminal trial, on the other hand, is "to vindicate society's insistence that every citizen obey the penal laws."  (*Ibid*.)  *Percifull* concluded that, "[t]o permit the issues tendered by the felony charges to be resolved on the basis of a determination that the child did not come within the jurisdictional provisions of the dependency statute

would be to frustrate the right of all the people of California to insist on enforcement of their penal laws through the medium of the criminal trial process." (*Ibid*.)

*Percifull* held that the aims and tactics of dependency and criminal proceedings were in direct conflict, in that the juvenile court is bound to preserve and strengthen the minor's family ties when possible, whereas a successful criminal prosecution is expected to culminate in prison sentences for one or both parents, thus disrupting the family. (*Percifull, supra*, 9 Cal.App.4th at p. 1462.) "Thus tactics devised by public counsel in the dependency proceeding, influenced by the need to preserve the family if possible, may not serve the public's interest in imposing legislatively specified punishment for child abuse. Whether the tension between these goals is in any sense undesirable is a judgment for the Legislature to make; so long as the conflict is legislatively ordained, the sound policies recognized in *Lucido* require that the criminal prosecution be permitted to proceed notwithstanding a finding of no jurisdiction in the dependency proceeding." (*Ibid*.)

*Percifull* concluded the differences in purpose between the two proceedings justified the second proceeding, even at the risk of an inconsistent result. (*Percifull, supra*, 9 Cal.App.4th at p. 1462.) It stated, "there is no consideration so compelling as to outweigh the public's right to have the parents' criminal culpability separately and fully assessed in the criminal trial process, even if the result of that assessment may ultimately be, or be perceived to be, inconsistent with the conclusion the juvenile court reached." (*Ibid*.)

As in *Lucido*, *Percifull* concluded that the above factors outweighed consideration of judicial economy. (*Percifull, supra*, 9 Cal.App.4th at p. 1463.) " 'Whatever the efficiencies of applying collateral estoppel in this case, they pale before the importance of preserving the criminal trial process as the exclusive forum for determining guilt or innocence as to new crimes.' " (*Ibid*., quoting *Lucido, supra,* 51 Cal.3d at p. 351.)

13

*Lucido* held that vexatious litigation is not repetitive litigation, but harassment through baseless or unjustified litigation. (*Lucido, supra,* 51 Cal.3d at p. 351.) *Percifull* concluded that the child abuse charges before it were neither baseless nor unjustified. (*Percifull, supra*, 9 Cal.App.4th at p. 1463.)

The public policy considerations that weighed in favor of the court's refusal to apply collateral estoppel in *Percifull* apply equally here. First, the purposes of the two proceedings, which *Lucido* considered the most important factor, are the same here as they were in *Percifull*. Here, those differing purposes likely result in the dependency proceeding being tried with different evidence than the criminal proceeding because of the differing timelines of the procedures. In light of the purposes of dependency proceedings (to preserve and strengthen the minor's family ties whenever possible) the hearings are required to be "expeditious." (§§ 202, 350.) Where, as here, a child is detained, a hearing must be held within 15 days. (§ 334.) A continuance may not be granted if it is contrary to the interests of the minor. (§ 352.)

By contrast, the time for commencing a felony trial runs 60 days from arraignment, and may be continued on a showing for good cause. (Pen. Code, § 1049.5.) This longer time means more time to investigate and uncover evidence that may be presented at the criminal trial.

The differing burdens of proof are another factor that convinces us collateral estoppel is inappropriate under these circumstances. The parents argue the lower burden of preponderance of evidence in the juvenile proceeding demonstrates there must be insufficient evidence in the criminal case. We disagree. Not only, as discussed above, does the county have less time to gather evidence for the juvenile hearing, but also it may have an incentive to refrain from putting on its full criminal case at the juvenile hearing, precisely because of the lower burden of proof. Here, for example, the doctor who performed Benjamin's autopsy was not called to testify at the juvenile dependency hearing.

14

Second, as in *Percifull*, and *Lucido*, the different purposes justify the criminal proceeding and outweigh considerations of judicial economy.

Finally, the record in this case, like that in *Percifull*, indicates the prosecution of the criminal action is not baseless or unjustified.  In the dependency proceeding, Butte County presented evidence Benjamin had been abused by introducing Benjamin's autopsy report, which concluded he died of anoxic encephalopathy due to blunt force trauma and craniocerebral injuries, with secondary conditions of malnutrition and hypothermia.  Butte County also presented the testimony of its expert pediatrician, who was also Benjamin's treating physician, and who testified Benjamin died of abusive head trauma that caused a subdural hematoma.  The pediatrician based her conclusion on the "massive amount of brain swelling, a large subdural hematoma, extensive retinal hemorrhages, and bruising on the ear" when Benjamin was brought to the hospital.  The pediatrician also based her conclusion on the fact that Benjamin was extremely underweight and suffering chronic malnutrition, and that he had a pattern of healing fractures in his arms, hands, and feet that was more commonly seen with abusive injury.

To counter Butte County's evidence, the parents presented their own experts who testified Benjamin's bone fractures could be explained by a rare inherited metabolic bone disease called hypophosphatasia.  The parents' expert opined that Benjamin had not died of head trauma, but of cortical venous thrombosis, which was a complication from an earlier bacterial infection.

The district attorney presented evidence in the later criminal case that ruled out the possibility Benjamin had been suffering from hypophosphatasia.[4]  While this was not a direct cause of Benjamin's death, it calls into question the reason for Benjamin's multiple broken bones, and removes the explanation of underlying disease for some of Benjamin's

---

[4]  The Baylor College of Medicine Medical Genetics Laboratories reported that Benjamin did not have the disorder.

15

injuries. This new evidence, together with, at a minimum, the autopsy report that Benjamin died of blunt force trauma, and the pediatrician's testimony that Benjamin's injuries and symptoms indicated nonaccidental abusive head trauma, is sufficient to support a conclusion that the criminal proceeding is not baseless or unjustified.

Also, as *Percifull* recognized, "One critically important element of the criminal trial process is the exercise of the district attorney's sound discretion as to whether prosecution is or is not warranted in any particular case. In the case before us we would trust the district attorney to exercise his or her discretion with wisdom and caution, taking into account not only the state of the evidence and the right of the people to enforcement of the penal laws, but also the order of the juvenile court, the current status of the reunited family . . . and the impact already made upon the parents by the anguish and expense of the dependency proceedings." (*Percifull, supra*, 9 Cal.App.4th at p. 1463.)

*Percifull* is on all fours with the case before us because it considered the preclusive effect of a juvenile dependency proceeding on a criminal prosecution for child abuse. We find the reasoning of *Percifull* persuasive.

DISPOSITION

The petition for writ of mandate is denied. The stay of the jury trial is vacated upon issuance of the remittitur.

/s/
Blease, Acting P. J.

We concur:

/s/
Hull, J.

/s/
Murray, J.

16